2006 OK CR 34

**James Allen CODDINGTON, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2003–887.**

Court of Criminal Appeals of Oklahoma.

Aug. 16, 2006.

Fern Smith, Christy Reid, Asst. District Attorneys, Oklahoma City, OK, attorneys for the State at trial.

Tamra Spradlin, Tim Wilson, Asst. Public Defenders, Okla. Co. Public Defender's Office, Oklahoma City, OK, attorneys for the defendant at trial.

Andrea Digilio Miller, Emma Victoria Rolls, Asst. Public Defenders, Okla. Co. Public Defender's Office, Oklahoma City, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Seth S. Branham, Assistant Attorney General, Oklahoma City, OK, attorneys for State on appeal.

### OPINION

C. JOHNSON, Judge.

¶1 Appellant, James Allen Coddington, was convicted by a jury in Oklahoma County District Court, Case No. CF 97–1500, of First Degree Murder, in violation of 21 O.S.Supp.1996, § 701.7(A) (Count 1) and of Robbery with a Dangerous Weapon, in violation of 21 O.S.1991, § 801 (Count 2). Jury trial was held before the Honorable Jerry D. Bass, District Judge, on April 21st—May 1st, 2003. On Count 1, the jury found the existence of two aggravating circumstances: (1) the defendant was previously convicted of a felony involving the use or threat of violence,[1] and (2) the murder was especially heinous, atrocious, or cruel.[2] The jury set punishment at death on Count 1 and life imprisonment without the possibility of parole on Count 2. Judgment and Sentence was imposed in accordance with the jury's verdicts.

¶2 Coddington gave timely notice of his intent to appeal the convictions and sentences. The record on appeal was completed September 3, 2004. Coddington filed his Brief of Appellant on November 8, 2004, and the State filed the Brief of Appellee on March 8, 2005. Coddington filed a Reply Brief on March 28, 2005. This matter was originally set for oral argument on October 18, 2005. At Coddington's request, oral ar-gument was rescheduled and was subsequently held on November 8, 2005. The parties each filed supplemental authorities on November 18, 2005.

¶3 In early March of 1997, Appellant, a cocaine addict, suffered a relapse and began using cocaine again. He estimated he spent one thousand dollars ($1000.00) a day to support his habit. Within a short time, he was desperate for money and robbed a convenience store on March 5, 1997 to feed his habit. The robbery did not yield enough money, so Coddington went to his friend Al Hale's home to borrow fifty dollars ($50.00).

¶4 Hale, then 73 years old, worked with Coddington at a Honda Salvage yard. Hale had previously loaned Coddington money and had also contributed towards Coddington's previous drug treatment. Hale's friends and family knew he kept a large amount of cash at his home. On March 5, 1997, he had over twenty-four thousand dollars ($24,000.00) stashed in his closet.

¶5 Coddington went to Hale's home on the afternoon of March 5, 1997 to borrow money, because he had been on a cocaine binge for several days and needed money for more cocaine. Coddington watched television with Hale for an hour or two and then smoked crack cocaine in Hale's bathroom. Hale knew Coddington was using cocaine again. Hale refused to give him money and told him to leave. As he was leaving, Coddington saw a claw hammer in Hale's kitchen, grabbed it, turned around and hit Hale at least three times with the hammer. Coddington believed Hale was dead, so he took five hundred twenty-five dollars ($525.00) from his pocket and left. Following the attack on Hale, Coddington robbed five more convenience stores to get money for cocaine.

¶6 Oklahoma City police detectives arrested Coddington on March 7, 1997, outside of his apartment in south Oklahoma City. Coddington told one officer he had been on a cocaine binge. On the way to the police department, Coddington tried to choke himself by wrapping the seat belt around his

---

1. 21 O.S.1991, § 701.12(1)

2. 21 O.S.1991, § 701.12(4)

neck. He also stated he wanted to die. At the police station, during an interview with a robbery detective and a homicide detective, Coddington confessed to the convenience store robberies and also to the murder of Mr. Hale. He admitted he struck Mr. Hale in the head with a claw hammer and believed Hale was dead when he left. At trial, Coddington admitted he murdered Hale. He testified he did not go to Hale's house with the intent to do anything except borrow money to buy more cocaine. He said he did not have a weapon with him, did not intend to rob Hale, and did not intend to kill him.

¶ 7 Ron Hale, the victim's son, discovered Hale after the attack on the evening of March 5, 1997. There was blood and blood spatter everywhere. Hale was lying in his bed, soaked in blood, still breathing but unable to speak. Hale was transported first to Midwest City Hospital and then to Presbyterian Hospital. He died approximately twenty-four hours later. An autopsy showed Hale died from blunt force head trauma. The medical examiner testified he sustained at least three separate blows to the left side of his head, consistent with being hit in the head with a claw hammer. He also testified Hale had defensive wounds.

¶ 8 Coddington admitted that he did not call the police when he left Hale's house because he did not want to get caught. He also admitted he had prior felony convictions.

¶ 9 Other relevant facts will be discussed under the related propositions of error.

## JURY ISSUES

■ ¶ 10 In Proposition Two, Coddington contends he was denied an impartial jury comprised of a fair cross-section of the community when the State exercised five peremptory challenges against minority jurors in violation of his state and federal constitutional rights and in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The State exercised peremptory challenges to exclude four of six African–American jurors from the jury panel of thirty. Coddington claims the State also exercised a peremptory challenge to excuse a woman of "Spanish heritage."

■ ¶ 11 A defendant may raise an equal protection challenge to the use of peremptory challenges by showing that the prosecutor used the challenges for the purpose of excluding members of the defendant's own race from the jury panel. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723–1724; *see also Powers v. Ohio*, 499 U.S. 400, 415, 111 S.Ct. 1364, 1373, 113 L.Ed.2d 411 (1991)(extending *Batson* to include race-based exclusions even when the defendant and the potential juror are not of the same race). Under *Batson*, the defendant must first make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. Then, the burden shifts to the prosecutor to articulate a race-neutral explanation related to the case for striking the juror in question. The trial court must then determine whether the defendant has carried his burden of proving purposeful determination. *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724. The race-neutral reason given by the prosecutor need not rise to the level of justifying excusal for cause, but it must be a "clear and reasonably specific" explanation of his or her "legitimate reasons" for exercising the challenges. *Id.*, 476 U.S. at 98, *n.* 20, 106 S.Ct. at 1724, n. 20; *see also Neill v. State*, 1994 OK CR 69, ¶ 17, 896 P.2d 537, 546, *cert. denied*, 516 U.S. 1080, 116 S.Ct. 791, 133 L.Ed.2d 740 (1996); *Short v. State*, 1999 OK CR 15, ¶ 12, 980 P.2d 1081, 1091, *cert. denied*, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000). The trial court's findings are entitled to great deference, and we review the record in the light most favorable to the trial court's ruling. *Batson*, 476 U.S. at 98, n. 21, 106 S.Ct. at 1724, n. 21; *Neill, id.*; *Bland v. State*, 2000 OK CR 11, ¶ 9, 4 P.3d 702, 710–711, *cert. denied*, 531 U.S. 1099, 121 S.Ct. 832, 148 L.Ed.2d 714 (2001).

¶ 12 Defense counsel objected to the prosecutor's exercise of peremptory challenges against African–American jurors, and in response, the State articulated the following reasons for excusing those jurors: the State excused Juror Christian because he had been prosecuted by the Oklahoma County District Attorney's office for embezzlement and had a brother in prison; the prosecutor excused Juror Mann because the prosecutor believed

he could not impose the death penalty and did not believe he truly had a change of heart after taking a walk; the prosecutor excused Juror Graham, because she had previously been prosecuted for embezzlement; the prosecutor excused Juror Mensah, because she had previously been prosecuted for fraud, because her brother was being prosecuted for larceny, and because she acted totally disinterested in what was going on during *voir dire.* Defense counsel did not object to the State's excusal of Juror Equigua, but now asks this Court to consider her removal in its consideration of the State's "pattern" of excusing minority jurors.[3] Defense counsel argued that excusing African–American jurors based upon prior contact with the criminal justice system had a disparate impact on the jury because a higher percentage of that minority population have had contacts with the criminal justice system and there are fewer "non-disenfranchised" African–Americans available for jury service.

¶ 13 The trial court did not specifically rule on the "race-neutral" reasons offered by the State and did not specifically overrule defense counsel's objection to the disparate impact the State's exercise of peremptories had on the jury. However, *voir dire* continued, the alternate jurors were selected, and the record reflects the trial court accepted the prosecutor's stated reasons for removing these minority jurors and did not believe the reasons were pretexts for purposeful discrimination.

¶ 14 The reasons offered by the State for excusing Jurors Christian, Mann, Graham, and Mensah were facially valid and do not reveal an intent to discriminate on the basis of race. *Short v. State,* 1999 OK CR 15, ¶ 15, 980 P.2d at 1092 ("[e]xcusal of a potential juror because of a prior criminal record or because of the criminal records of family members are legitimate reasons for removal"); *Harris v. State,* 2004 OK CR 1, ¶ 21, 84 P.3d 731, 743 (removal of juror because prosecutor believed she was not being truthful

was not only race-neutral but plausible). "The critical question in determining whether a prisoner has proved purposeful discrimination ... is the persuasiveness of the prosecutor's justification for his peremptory strike.... 'implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.'" *Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003), *citing Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). Here, the trial court accepted the prosecutor's reasons for striking the four African–American jurors, and its "decision on the issue of discriminatory intent will not be overturned unless we are convinced that determination is clearly erroneous." *Short,* 1999 OK CR 15, ¶ 17, 980 P.2d at 1092, *citing Hernandez v. New York,* 500 U.S. 352, 369, 111 S.Ct. 1859, 1871–1872, 114 L.Ed.2d 395 (1991).

¶ 15 The record shows the prosecutor also exercised a peremptory challenge against a Caucasian juror because of his past contact with the District Attorney's office or the criminal justice system.[4] At least two African–American jurors were among those finally seated in this case. The record does not suggest the crimes prosecuted in this case were in any way racially motivated. As in *Short,* the record does not show the prosecutor was exercising the State's peremptory challenges to purposefully discriminate and exclude jurors on the basis of race, and the trial court's decision to accept the prosecutor's reasons for excusing the four African–American jurors was not clearly erroneous. *Black v. State,* 2001 OK CR 5, ¶ 31, 21 P.3d 1047, 1061, *denied,* 534 U.S. 1004, 122 S.Ct. 483, 151 L.Ed.2d 396 (2001)(review is only for clear error by the trial court and we review the record in a light most favorable to the trial court's ruling).

¶ 16 Defense counsel did not object to the prosecutor's exercise of peremptory challenge against Juror Equigua, and the State

---

3. The record of *voir dire* shows Juror Equigua was divorced and that the name Equigua originated from the "Basque region of Spain." This record does not show this juror was, in fact, a minority juror. It only shows her name originated from another country.

4. The State exercised its second peremptory to excuse Juror McGaugh—a "white male" who was previously prosecuted for DWI and DUI.

was therefore not required to give a race-neutral reason for her excusal. Because no objection was made at trial, our review is for plain error. *Wackerly v. State*, 2000 OK CR 15, ¶ 7, 12 P.3d 1, 7, *cert. denied*, 532 U.S. 1028, 121 S.Ct. 1976, 149 L.Ed.2d 768 (2001). Coddington suggests Juror Equigua's excusal is "probative of a pattern of discrimination." We disagree. Coddington has not made a *prima facie* showing the peremptory challenge against Juror Equigua was made on the basis of race. The record does not establish that Juror Equigua was, in fact, a woman of a minority race. *See f.* 1 *supra.* We find no plain error.

¶ 17 In this case, the prosecutor's exercise of peremptory challenges against African–American jurors because of prior contact with the criminal justice system was a sufficiently, race-neutral reason to survive Coddington's *Batson* objections. The ratio of African–American jurors called at the beginning of *voir dire* (1:6) compared to those who remained and were seated on Coddington's jury (1:5) was about the same. Coddington has not shown he was deprived of a jury composed of a fair cross-section of the community due to the excusal of minority jurors.

¶ 18 On the first day of witness testimony, during the examination of Scott Cox, defense counsel informed the trial court that Juror Muller appeared to be "nodding off and sleeping. She's about to fall out of her chair." Defense counsel asked the trial court to watch the juror and, at break, to talk to her. Assistant District Attorney Reid also noted the same conduct. The trial court watched the juror and a short while later, the trial court called the attorneys to the bench and stated "[s]he is nodding off ...". At defense counsel's request, the trial court spoke with Juror Muller in chambers. During this colloquy, Juror Muller told the trial court she was feeling strange and "not very well;" she thought it was something to do with her blood sugar. Juror Muller told the trial court she was having difficulty with her vision and walking.[5]

¶ 19 Juror Muller tested her blood sugar in the presence of the trial court, defense counsel and counsel for the State, and determined it was high. When asked if there was anything she could do to bring it down, she told the trial court exercise was all that she could do.

¶ 20 The trial court allowed the parties to question Juror Muller and her answers revealed she felt she had heard all of the questions asked and answers given, did not think she had missed anything, and felt she could remain on the jury and be alert and attentive. She admitted to defense counsel that, in addition to her sleepiness, she had an upset stomach and a little headache and that it had been "gradually getting worse today."

¶ 21 After the parties questioned Juror Muller, defense counsel asked the trial court to continue to observe her and then to "revisit the issue ... at 1:30" to see how she was feeling. Defense counsel stated, "I think we ought to go on. I mean, let's keep putting witnesses on and if she starts nodding off again then we may have to stop it, Judge. ...." The trial court again agreed to keep an eye on her.

¶ 22 Following cross-examination of the witness, court recessed for lunch and the jurors were asked to return at 1:30. When the jury returned, the trial court told the parties, "[I]nformally I spoke with Juror Muller. She insists that she's doing just fine." Defense counsel asked the trial court to continue to watch her. The record contains no further specific references to Juror Muller.

■ ¶ 23 In Proposition Three, Coddington contends the trial court's failure to replace Juror Muller with an alternate juror deprived him of his right to a fair trial by a jury of twelve. Coddington submits the trial court had the statutory authority to remove a sick juror and to replace that juror with an alternate and suggests his failure to use that

5. Before opening statements, the trial court made the following statement: "Does anybody have any particular medical needs? Sometimes I have people that are diabetics and they have to eat candy or they have to take regular medications. Does anybody have any regular medication or anything that they need to take? Anything at all?" The record reflects no juror responded.

authority *sua sponte* was an abuse of discretion.

¶ 24 A criminal defendant charged with murder is entitled to a trial by a jury composed of twelve people. Okla. Const. art. II, § 19; U.S. Const. amends. VI, XIV. "In a capital murder case in which the jury found guilt and set punishment at death, the participation of a juror who "dosed (sic) during parts of the trial" is an unacceptable degradation of due process which requires reversal." *Spunaugle v. State,* 1997 OK CR 47, ¶ 34, 946 P.2d 246, 253, *overruled on other grounds in Long v. State,* 2003 OK CR 14, ¶ 18, 74 P.3d 105.

¶ 25 Juror misconduct must be proven by clear and convincing evidence. *Spunaugle,* 1997 OK CR 47, ¶ 33, 946 P.2d at 253. "A trial judge has inherent power to substitute a juror for good cause." *Miller v. State,* 2001 OK CR 17, ¶ 23, 29 P.3d 1077, 1082. 22 O.S.2001, § 601a provides for the use of alternate jurors to replace jurors who are sick or who have died; however, the trial court's discretion to substitute jurors is not limited to cases of sickness or death. *Miller,* 2001 OK CR 17, ¶ 23, n. 5, 29 P.3d at 1083. This discretion ought to be exercised with great caution, especially in capital cases. *Id.*

¶ 26 The trial court could have exercised its discretion and properly removed Juror Muller and replaced her with an alternate juror because she was obviously sleepy due to a blood sugar problem. We found the trial court's belief that the juror in *Miller* was ill was a sufficient basis for her dismissal. *Id.,* 2001 OK CR 17, ¶ 26, 29 P.3d at 1083. However, in this case, defense counsel did not request Juror Muller's removal due to illness and did not object when the trial court did not remove her.

¶ 27 The trial court acted within its discretion by keeping Juror Muller on the jury, and no plain error occurred. First, defense counsel specifically *did not* request the trial court to remove Juror Muller; rather, defense counsel stated the trial "ought to go on" and asked the trial court to continue to watch her. Second, the record does not conclusively show Juror Muller was sleeping;

she stated she had not missed any of the questions asked or answered and felt she could continue as an alert and attentive juror. Third, nothing further appears in the record which would indicate her sleepiness due to illness continued to be a problem after the lunch recess on the first day of trial testimony.

¶ 28 Alternatively, Coddington argues his trial counsel was ineffective for failing to request the trial court to remove this juror. While the trial court might properly have removed Juror Muller if the record conclusively showed she was sleeping or was too ill to continue, defense counsel specifically stated the trial "ought to go on" and did not request the trial court to remove her as a matter of trial strategy. In hindsight, it may appear to Coddington that his defense counsel's decision to give this juror another chance was not appropriate, but that is not sufficient to meet the test for ineffective assistance of counsel established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This Court does not evaluate trial strategy in hindsight. *Woodruff v. State,* 1993 OK CR 7, ¶ 16, 846 P.2d 1124, 1133, cert. denied, 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993). Further, the record does not establish this juror missed any of the testimony due to inattentiveness or illness and Coddington has not shown he was prejudiced by his trial counsel's failure to request her removal from the jury. Proposition Three does not warrant relief.

### FIRST STAGE ISSUES

¶ 29 In Proposition One, Coddington claims his in custody extra judicial confession should not have been admitted, because his waiver of *Miranda*[6] rights was "unknowing and involuntary." First, he argues that because he was read his *Miranda* rights in relation to the robbery investigations, but not in relation to the homicide investigation, his subsequent confession to the homicide was made in violation of his Fifth and Fourteenth Amendment rights against self-incrimination and right to counsel, and in violation of Okla.

6. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Const. art. 2, § 21. Secondly, he argues that he was incapable of knowingly and voluntarily waiving his rights at all, because he was "high, sleep deprived, hungry and suicidal" at the time of the interrogation. Coddington therefore claims the admission of his confession violated his Fifth and Fourteenth Amendment rights under the federal constitution and corresponding provisions of the Oklahoma Constitution.

¶ 30 During a hearing to determine the admissibility of Coddington's statements,[7] former Oklahoma City police officer Smart testified he advised Coddington of his *Miranda* rights after robbery detectives arrested him as a suspect in a string of armed robberies. They were standing outside of Coddington's apartment when Coddington began making voluntary statements. Smart immediately read him his *Miranda* rights. He stated Coddington said he understood his rights, waived them, and continued to make statements. He also signed a search waiver for his apartment. He said Coddington did not appear to be drunk or high on drugs; he walked normally and was coherent of his environment.

¶ 31 Former Oklahoma City police detective Despain interviewed Coddington at the police department a couple of hours later. Despain did not re-advise Coddington of his *Miranda* rights because Coddington had already been read and waived those rights. Coddington told Despain he remembered being so advised. Despain said Coddington did not appear to be under the influence; he was talkative, rational and alert. Despain's interview with Coddington was videotaped.

¶ 32 Coddington does not dispute that he was read his *Miranda* rights or that he waived those rights at the time of his arrest for the armed robberies. In fact, at trial, Coddington admitted that he waived his rights and voluntarily talked to the detectives on this case. Coddington now complains that he was not readvised of those rights when the interrogation turned towards his involvement in the homicide. Because the invocation of one's *Miranda* rights is non-offense specific, Coddington argues the opposite

must also be true—a knowing and voluntary waiver of *Miranda* cannot occur unless the suspect is advised of what crime or crimes he is a suspect. In effect, he argues that his waiver of *Miranda* and resulting statement was compelled in violation of the Fifth Amendment, because he waived his rights without being informed he would be questioned about crimes for which he was not arrested.

¶ 33 This argument "strains the meaning of compulsion past the breaking point." *Colorado v. Spring*, 479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987). Voluntariness of a confession is judged by examining the totality of the circumstances, including the characteristics of the accused and the details of the interrogation. *Van White v. State*, 1999 OK CR 10, ¶ 45, 990 P.2d 253, 267. The inquiry has two aspects—the relinquishment of the right must be voluntary in that it was a product of free, deliberate choice, rather than coercion, intimidation or deception; and, the waiver must have been made with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it. *See Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421 (1986). The trial court may properly find a valid waiver of *Miranda* rights where the totality of the circumstances show both an "uncoerced choice and the requisite level of comprehension...." *Id.*; *see also Lewis v. State*, 1998 OK CR 24, ¶ 34, 970 P.2d 1158, 1170, *cert. denied*, 528 U.S. 892, 120 S.Ct. 218, 145 L.Ed.2d 183 (1999). We have never required the requisite level of comprehension to include being informed of every possible offense about which one might be questioned.

¶ 34 After hearing the officers' testimony at the *in camera* hearing, the trial court watched Coddington's videotaped confession and found Coddington appeared to be "in some sort of heightened state of intoxication." However, the trial court found, based on the videotape, that Coddington was not threatened, coerced or promised anything, and nothing indicated his statements

---

7. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) established a defendant's right to an *in camera* hearing on the voluntariness of a confession.

were made against his will. After considering the totality of the circumstances, the trial court admitted the taped confession and the physical evidence derived from it. The question of the voluntariness of Coddington's waiver was a fact question to be resolved by the jury and the trial court instructed the jury accordingly. The trial court's ruling to admit the statement was supported by competent evidence of the voluntary nature of the statement. *Bryan v. State*, 1997 OK CR 15, ¶ 17, 935 P.2d 338, 352, *cert. denied*, 522 U.S. 957, 118 S.Ct. 383, 139 L.Ed.2d 299 (1997).

¶ 35 Officer Smith testified he read *Miranda* warnings to Coddington, and Coddington indicated he understood his rights and waived them. At the beginning of the interview at the police station, Officer Despain said, "Ok (sic), again, I'm Sgt. DeSpain, this is Det. Wes Weaver, uh now I understand uh that Sgt. Smart advised you of your rights earlier and you signed a search waiver." Coddington responded, "Yeah." Sgt. Despain said, "You remember that." Coddington replied, "Yeah." Throughout the interview, Coddington was cooperative and did not appear to be coerced or threatened in any way. Further, after answering questions relating to the burglaries, Coddington said, "Uh, you need to get homicide down here." He then confessed to Hale's murder and willingly provided the detectives with details about the crime. At trial, Coddington testified he was read his rights and voluntarily waived them.

¶ 36 There is no question that Coddington was informed of his *Miranda* rights and waived them. He exhibited no reluctance in speaking with the detectives about the robberies or the homicide. In fact it was he who volunteered statements about the homicide and initiated the discussion about the homicide. The relevant inquiry is whether the suspect understands the rights at stake and the consequences of waiving them. *Colorado v. Spring*, 479 U.S. at 573, 107 S.Ct. at 857. His "awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Id.*, 479 U.S. at 577, 107 S.Ct. at 859. The trial court's decision to admit Coddington's confession and let the jury determine whether it was knowingly and voluntarily made was proper and was supported by the record.

¶ 37 Coddington also argues he was "incapable of knowingly and voluntarily waiving his rights as he was high, sleep deprived, hungry and suicidal at the time of the interrogation." While the officers who testified at the *Jackson v. Denno* hearing both indicated Coddington appeared coherent and rational and neither thought he was under the influence of intoxicants, the trial court did not agree and specifically found that Coddington appeared to be in some "heightened state of intoxication." Coddington admitted he had been using cocaine for several days and had not eaten or slept. Still, his fatigue and hunger from drug usage do not render his waiver of *Miranda* involuntary.

¶ 38 "[S]elf-induced intoxication, short of mania, or such an impairment of the will and mind as to make the person confessing unconscious of the meaning of his words, will not render a confession inadmissible, but goes only to the weight to be accorded to it." *Moles v. State*, 1974 OK CR 57, ¶ 6, 520 P.2d 822, 824. Coddington gave specific details about both the robberies and the murder of Mr. Hale, and appeared to understand exactly what was going on. That he also confessed to crimes which could not be corroborated does not show he was so intoxicated that his *Miranda* waiver was not knowingly and voluntarily made. Further, from his prior contacts with law enforcement and prior convictions, we can assume he was familiar with and understood the "concepts encompassed in *Miranda*." *Smith v. Mullin*, 379 F.3d 919, 934 (10th Cir.2004).

¶ 39 Coddington simply has not shown his *Miranda* rights waiver was not knowingly and voluntarily made. The admission of his confession and the physical evidence derived therefrom did not deprive Coddington of his state or federal constitutional rights. Proposition One is therefore denied.

¶ 40 In Proposition Four, Coddington argues the trial court's limitations on the testimony of Dr. J.R. Smith deprived him of his Fifth, Sixth, and Fourteenth Amendment

rights to present a defense and confront the State's evidence. Prior to trial, the State filed a Motion in Limine to prohibit the defense expert from testifying that Coddington could not have formed the requisite intent of malice aforethought due to his cocaine intoxication. At trial, prior to the examination of the expert defense witness, the trial court sustained the State's Motion in Limine, "keeping in line with *White v. State*," and instructed defense counsel that its expert could "suggest the inferences the jury should draw from the application of his specialized knowledge ... as long as he refrained from merely telling the jury what result to reach." Following the trial court's ruling, defense counsel argued that *Hooks v. State* and *White v. State*[8] were unconstitutional and violated the "Fourteenth Amendment fundamental fairness clause and equal provisions in the Oklahoma state constitution." The defense made the following offer of proof in response to the trial court's ruling:

> If permitted to testify as to the effect of James Coddington's cocaine addiction and his ability to form malice aforethought Dr. Smith would testify that on 5 March in his opinion that to a reasonable degree of medical certainty James Coddington would not have been able to form the intent of malice aforethought and that he would have been experiencing the effects of the cocaine to such a degree that the brain would be unable to formulate that specific intent and we would propound that question and we would urge the grounds that we have made in the previous record.

¶ 41 Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. 12 O.S.2001, § 2704. "Any properly qualified expert testifying in accordance with the standards governing admissibility of expert testimony may offer an opinion on the ultimate issue if it would assist the trier of fact."

*Johnson v. State*, 2004 OK CR 25, ¶ 16, 95 P.3d 1099, 1104. The "otherwise admissible" language of § 2704 must be read in context with 12 O.S.2001, §§ 2403 (amended 2003), 2701, 2702 (amended 2002). *Romano v. State*, 1995 OK CR 74, ¶ 21, 909 P.2d 92, 109, *cert. denied*, 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996). "While expert witnesses can suggest the inferences which jurors should draw from the application of specialized knowledge to the facts, opinion testimony which merely tells a jury what result to reach is inadmissible." *Id.; see also Hooks v. State*, 1993 OK CR 41, ¶ 13, 862 P.2d 1273, 1278, *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994). "[W]here the normal experiences and qualifications of laymen jurors permit them to draw proper conclusions from the facts and circumstances, expert conclusions or opinions are inadmissible." *Gabus v. Harvey*, 1984 OK 4, ¶ 18, 678 P.2d 253, 255.

¶ 42 The normal experiences and qualifications of laymen jurors likely do not provide an understanding of the effects of cocaine intoxication on one's ability to control behavior, to think rationally, and to form an intent to kill. An expert's opinion on the effects of cocaine intoxication would have been helpful to the trier of fact. While Dr. Smith could not, under our case law, tell the jury what result to reach, Dr. Smith could properly have testified that, in his expert medical opinion, Coddington would have been unable to form the requisite malice. Such testimony would not "simply have told the jury what result to reach." Experts for the State routinely testify to conclusions drawn from their specialized knowledge even on ultimate issues. *See e.g. Lott v. State*, 2004 OK CR 27, ¶¶ 84–88, 98 P.3d 318, 342–343, *cert. denied*, 544 U.S. 950, 125 S.Ct. 1699, 161 L.Ed.2d 528 (2005)(State's expert on sexual assault could properly testify rape was result of non-consensual sex and conclude oral sodomy had occurred based upon her examination of physical evidence); *Abshier v. State*, 2001

---

**8.** In *Hooks v. State*, 1993 OK CR 41, ¶ 16, 862 P.2d 1273, 1279, we said that when the defendant attempts to elicit expert testimony on the issue whether he possessed the requisite intent to commit the crime in question, that testimony should be excluded. In *White v. State*, 1998 OK CR 69, ¶¶ 14–15, 973 P.2d 306, 311, where the defendant sought to introduce expert testimony on whether his intoxication affected his mental state and prevented him from forming malice aforethought, we stated such evidence "was not prohibited by *Hooks*" even though it would have embraced an ultimate issue to be decided by the trier of fact.

OK CR 13, ¶116, 28 P.3d 579, 604, cert. denied, 535 U.S. 991, 122 S.Ct. 1548, 152 L.Ed.2d 472 (2002), rev'd on other grounds by Jones v. State, 2006 OK CR 17, 134 P.3d 150 (State's expert witness could testify that child was conscious and crying during beating from defendant based upon his experience and studies); Welch v. State, 2000 OK CR 8, ¶¶ 21–23, 2 P.3d 356, 368–369, cert. denied, 531 U.S. 1056, 121 S.Ct. 665, 148 L.Ed.2d 567 (2000)(Detective's testimony that victim's death was not self-inflicted or the result of auto-erotic behavior, that her death was not accidental but intentionally inflicted, and her wounds were not consistent with sexual asphyxiation was properly admitted and based upon his specialized knowledge of homicide investigations).

¶ 43 Here, Coddington raised sufficient evidence for the trial court to instruct the jury on his defense of voluntary intoxication. When a defendant raises the defense of voluntary intoxication, an expert may properly offer his or her opinion on whether the defendant's actions were intentional. Malicoat v. State, 2000 OK CR 1, ¶ 11, 992 P.2d 383, 395, cert. denied, 531 U.S. 888, 121 S.Ct. 208, 148 L.Ed.2d 146 (2000); White, 1998 OK CR 69, ¶ 15, 973 P.2d at 311. Dr. Smith could have properly testified that, in his opinion and based upon his specialized knowledge, he believed Coddington would have been unable to form the requisite deliberate intent of malice aforethought. The trial court erred and abused its discretion by sustaining the Motion in Limine and so limiting the expert witness' testimony. See Davis v. State, 2004 OK CR 36, ¶ 30, 103 P.3d 70, 79 (admission of evidence lies within the discretion of the trial court).

¶ 44 Coddington contends the trial court's limitation of Dr. Smith's testimony violated his fundamental right to present a defense, was prejudicial, and warrants reversal of his conviction. The State responds that Coddington's intoxication defense was "meritless," would not have been affected by the proposed testimony, and the limitation on Dr. Smith's testimony was harmless beyond a reasonable doubt. We disagree with the State's position that Coddington's jury was "erroneously instructed" on the defense of voluntary intoxication. The trial court found sufficient evidence of intoxication and also noted the State itself had suggested it. The question is whether the proposed, excluded, testimony would have made a difference; we believe it would not.

¶ 45 Dr. Smith testified about Coddington's family history, his medical history, and his history of drug use. He testified about the properties of cocaine and about the effects of cocaine in general upon the body and the brain. He testified about cocaine addiction, how it happens quickly, and how certain people, like Coddington, are more vulnerable to it. He testified that Coddington was a cocaine addict. He testified how cocaine affects the part of the brain one thinks with, how it affects what one does, one's ethics, one's judgment, how one behaves, and how one makes decisions. Seemingly the only thing his testimony did not cover was how cocaine intoxication might have affected Coddington on March 5, 1997, based upon his examination of Coddington's medical and drug abuse history, upon his observation of the videotaped confession, and based upon his prior experience and studies of cocaine addicts and addiction. On one hand, the jury heard testimony from Dr. Smith which would have been helpful to its consideration of Coddington's voluntary intoxication defense; on the other hand, the absence of the expert's opinion on Coddington's ability to specifically intend to commit the homicide was notable.

¶ 46 "Defendants in criminal trials deserve to have their day in court, to require the State to meet its burden of proof through evidence presented in open court, to tell their stories, and to defend themselves against the crimes of which they have been charged." Malone v. State, 2002 OK CR 34, ¶ 5, 58 P.3d 208, 209. A defendant's due process right under the Fifth Amendment and to compulsory process under the Sixth Amendment includes the right to present witnesses in his or her own defense. United States v. Dowlin, 408 F.3d 647, 659 (10th Cir.2005); see also Washington v. Texas, 388 U.S. 14, 18–19, 87 S.Ct. 1920, 1923, 18 L.E.2d 1019 (1967). "The right to offer the testimony of witnesses ... is in plain terms the right to present a defense.... This right is a

fundamental element of due process of law." *Washington, id.*

¶ 47 To determine whether Coddington was denied this fundamental right, we must first determine whether the trial court erred in excluding the testimony. Then, to establish constitutional error, Coddington must show the evidence was material to the extent its exclusion violated his right to present a defense. *Dowlin, id.* To determine materiality, we examine the entire record and must ask "whether the evidence was of such an exculpatory nature that its exclusion affected the trial's outcome." (citations omitted) *Id.*

¶ 48 The trial court clearly erred by limiting the testimony of Dr. Smith on the issue of Coddington's ability to form malice and Coddington's conviction cannot stand unless we find the error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Such testimony, while helpful to the jury and certainly material, was not exculpatory in the sense that it would have exonerated the defendant; but, if believed by the jury, the evidence certainly might have reduced the degree of homicide for which Coddington was convicted.

¶ 49 The exclusion of Dr. Smith's expert opinion testimony relating to Coddington's specific ability to form the requisite intent for malice murder did not prevent Coddington from putting forth significant evidence relating to cocaine intoxication. Dr. Smith testified extensively about the effects of cocaine addiction and intoxication on the brain, on decision-making and behavior. The evidence in this case was overwhelming, and we find, beyond a reasonable doubt, that Dr. Smith's expert opinion on the ultimate issue of whether Coddington could form the requisite malice would not have made a difference in the jury's determination of guilt. We find the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

¶ 50 In Proposition Five, Coddington argues he was denied due process, a fair trial and a reliable sentence because improper victim impact evidence was admitted during the first stage of trial. First, he complains that Ron Hale's unsolicited testimony that his brain disorder "got worse" when "my dad died" was irrelevant, prejudicial and constituted improper victim impact evidence. Secondly, he complains that the introduction of a photograph of the deceased while alive was irrelevant, prejudicial, denied him of a reliable sentence, and violated *ex post facto* principles.

¶ 51 During direct examination, because Ron Hale had obvious difficulty answering the prosecutor's questions, the prosecutor asked him if he suffered from a brain disease which made it difficult for him to come up with certain words. Hale answered,

> Yes. It's called Pick's disease. I lose simple words on the left side of my brain and it's because—even things that you say I know what you're talking about, but I can't hardly say them sometimes. Because this went way back in time to the day my dad died and that's when it got worse.

Upon defense counsel's announcement that it would not cross-examine Hale, the witness said, "Okay. I do have something that me and my sister and my brother would like to say down the road if we can ... There's something else I would like to say." Coddington complains this testimony was not only irrelevant and prejudicial but also that it constituted impermissible victim impact evidence. The State responds that the testimony relating to Pick's Disease was necessary to explain the witness' difficulty testifying; the State agrees Hale's last statement was inappropriate, but so innocuous that it did not amount to error warranting relief.

¶ 52 There was no objection to Hale's testimony and our review is for plain error. *Lott*, 2004 OK CR 27, ¶ 70, 98 P.3d at 340 (failure to object to witness testimony or to cross-examine witness waives all but plain error with regard to witness testimony). While the victim's son's neurological problem was not relevant to or probative of any issue to be proved at trial, the State elicited this testimony to explain to the jury why this witness had obvious difficulty expressing himself and answering the State's questions. We have no problem with its admission. Hale's testimony that his condition got worse after his father died called the jury's atten-

tion to the effect of his father's murder on him. This testimony was not solicited and no further attention was called to it by either the State or the defense. While it is improper for the prosecutor to ask jurors to have sympathy for the victim(s) and improper to introduce victim impact evidence during the first stage of trial, Hale's testimony relating to the aggravation of his disease following the death of his father was not solicited and was not so prejudicial to warrant relief. We find no plain error.[9] Review of this witness's testimony reflects a number of non-responsive and/or confusing answers and it is unlikely the jury was at all affected by Hale's spontaneous, unsolicited statement.

■■■ ¶ 53 Coddington also complains the admission of a single, pre-mortem photograph of the victim was irrelevant, prejudicial, denied him of a reliable sentence, and violated *ex post facto* principles. Coddington argues that when the legislature amended Section 2403, it created a *per se* rule of relevancy for pre-mortem photographs in homicide cases.

¶ 54 Title 12 O.S.Supp.2003, § 2403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise. *However, in a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim while alive.*

(emphasis added). Prior to its amendment in 2002, this Court interpreted the former Section 2403 to favor the admission of relevant evidence, but repeatedly held the admission of pre-mortem photographs of a homicide victim were inadmissible unless the photograph(s) was/were "relevant to some material

issue" and its "relevancy outweighs the danger of prejudice to the defendant." *Thornburg v. State*, 1999 OK CR 32, ¶ 23, 985 P.2d 1234, 1244; *see e.g. Tilley v. State*, 1998 OK CR 43, ¶ 32, 963 P.2d 607, 615; *Valdez v. State*, 1995 OK CR 18, ¶ 64, 900 P.2d 363, 381, *cert. denied*, 516 U.S. 967, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995); *Staggs v. State*, 1991 OK CR 4, ¶ 7, 804 P.2d 456, 458; *Cargle v. State*, 1995 OK CR 77, ¶ 82, 909 P.2d 806, 830. In *Hogan v. State*, 2006 OK CR 19, ¶ 60, 139 P.3d 907, this Court recognized that these pre–2002 amendment cases have been superceded by statute.

¶ 55 Coddington argues the placement of the amendatory language in the statutory provision which sets forth the balancing test for the exclusion of otherwise relevant evidence and the use of the words "shall be admissible" suggests the Legislature did not intend for the balancing test to apply to this whole category of evidence. *See Lenion v. State*, 1988 OK CR 230, ¶ 3, 763 P.2d 381, 382 ("shall" is generally considered mandatory and not permissive). By this amendment, the Legislature effectively overruled those cases where this Court required the live photograph to be "relevant to some material issue" and its relevancy to outweigh "the danger of prejudice to the defendant." Coddington proposes that the trial court can no longer exercise its discretion to exclude this whole category of evidence and it will be admitted without regard to its relevance and without regard to whether the evidence would unfairly prejudice the defendant. He argues it violates his statutory rights under the Oklahoma Evidence Code and deprives him of procedural and substantive due process.

■■■ ¶ 56 We disagree.

> The fundamental rule of statutory construction is to ascertain and give effect to the intention of the legislature as expressed in the statute. *Thomas v. State*, 404 P.2d 71, 73 (Okl.Cr.1965). "A statute should be given a construction

---

9. We also find trial counsel was not ineffective for failing to object to Hale's unsolicited statements. His decision not to call the jury's attention to the statement could be considered sound trial strategy. *Strickland*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984)(defendant must be able to overcome the presumption that counsel's actions could not be considered sound trial strategy).

according to the fair import of its words taken in their usual sense, in connection with the context, and with reference to the purpose of the provision." *Jordan v. State,* 763 P.2d 130, 131 (Okl.Cr.1988). *Wallace v. State,* 1996 OK CR 8, ¶ 4, 910 P.2d 1084, 1086. Unlike Oregon and Utah which have similar statutes mandating the admissibility of pre-mortem photographs [10], Oklahoma's amended § 2403 requires admission of an "appropriate" photograph of the homicide victim. The requirement that the photograph be "appropriate" preserves the trial judge's discretion in determining the admissibility of this evidence.[11] If the trial court determines the photograph is not appropriate—that its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise—the photograph can and should be excluded. *See* 12 O.S.Supp.2003, § 2403. The amended statute does not deprive a defendant of the statutory principles of admissibility set forth in the Oklahoma Discovery Code.

¶ 57 The pre-mortem photograph of the victim was properly admitted. The photograph the State originally sought to introduce was of the deceased holding a small child, presumably a grandchild. The defense objected that the statute did not contemplate a photograph of anyone but the deceased and objected that the photograph was more prejudicial than probative.[12] The State offered to "cover up" the child with a Post–It note. The trial court ruled the Post–It note cover up was not sufficient and agreed to admit the photograph only after the State redacted the child from the picture. State's Exhibit 87 was thereafter admitted and it pictures only the deceased. The trial court's action in this case demonstrates his exercise of discretion and the application of the probative value/unfair prejudice balancing test allowed by the amended statute.

¶ 58 In *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991), the Supreme Court held that victim impact evidence is relevant for a jury to meaningfully assess the defendant's moral culpability and blameworthiness and is only inadmissible where it is so unduly prejudicial that it renders the trial fundamentally unfair. The introduction of a single pre-death photograph of the victim was appropriate to show his general appearance and condition prior to his death. It did not inject passion, prejudice, or other arbitrary factors into the sentencing stage more than any other relevant victim impact evidence. We find the trial court did not abuse its discretion when it admitted the photograph, the statute is not unconstitutional on its face or as applied, and Coddington was not deprived of a fair trial or a fair sentencing proceeding as a result of its admission.

¶ 59 Section 2403, as amended, also does not run afoul of *ex post facto* principles. The prohibition against *ex post facto* law requires the finding of two elements: that the law was enacted after the conduct to which it is being applied and that it must disadvantage the offender affected by it. *Gilson v. State,* 2000 OK CR 14, ¶ 97, 8 P.3d 883, 914, cert. denied, 532 U.S. 962, 121 S.Ct. 1496, 149 L.Ed.2d 381 (2001). In *Neill v. Gibson,* 278 F.3d 1044 (10th Cir.2001), the Tenth Circuit rejected a claim that Oklahoma's victim impact evidence statute violated the *Ex post Facto* and Due Process clauses. In *Neill,* the appellant advanced the same argument as that raised by Coddington—that application of the statute, not in effect at the time of his crime, implicated the

> fourth category of *ex post facto* legislation recognized in *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798)—

---

10. *See* Or. Rev.Stat. § 41.415 (2001) and UTAH CODE ANN. § 77–38–9(7)(1999).

11. While Oklahoma, Oregon and Utah are among the *few* States which require the admission of pre-mortem victim photographs offered by the prosecution in homicide cases, a majority of States for many years have held such photographs to be admissible when relevant. *See e.g.*

*State v. Broberg,* 342 Md. 544, 556–557, 677 A.2d 602, 607–608 (1996)(citing other jurisdictions upholding admissibility of in-life photographs).

12. Defense counsel also objected that the statute should not apply to Coddington because it was not in effect at the time he committed the offense. (Tr.III 8–9)

"[e]very law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender."

*Id.* at 1051. Neill relied on *Carmell v. Texas*, 529 U.S. 513, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000), arguing the Supreme Court reaffirmed the fourth category of *Calder* and noting the state court (this Court) rejected his claim below without addressing this category of *ex post facto* violations. Rejecting Neill's claim, the Tenth Circuit said, "Oklahoma's victim impact statute does not change the quantum of evidence necessary for the State to obtain a death sentence, nor does it otherwise subvert the presumption of innocence." *Id.* at 1051, *citing Carmell,* 529 U.S. at 530–34, 120 S.Ct. 1620, and *Thompson v. Missouri,* 171 U.S. 380, 387, 18 S.Ct. 922, 43 L.Ed. 204 (1898). *See also Pennington v. State,* 1995 OK CR 79, ¶¶ 78–80, 913 P.2d 1356, 1372, *cert. denied,* 519 U.S. 841, 117 S.Ct. 121, 136 L.Ed.2d 72 (1996). Further, the "fourth criterion" set forth in *Calder* does not prohibit the application of new evidentiary rules in trials for crimes committed before the evidentiary changes. *See e.g. Collins v. Youngblood,* 497 U.S. 37, 43, f. 3, 110 S.Ct. 2175, 2719, f. 3, 111 L.Ed.2d 30 (1990).

¶ 60 Like victim impact evidence, the admissibility of a single Section 2403 "live photograph" does not change the quantum of evidence necessary for the State to obtain a conviction and also does not subvert the presumption of innocence. Application of the amended Section 2403 in Coddington's case does not violate the *ex post facto* principles set forth in either the federal or our state constitution. U.S. Const. art. I, § 9; Okla. Const. art.II, § 15.

■ ¶ 61 In Proposition Six, Coddington complains three prosecution witnesses [13] testified to the details of the crime scene and to the victim's condition. He argues the presentation of this cumulative evidence during the first stage of trial unfairly prejudiced him and resulted in an unfair trial and sentencing determination in violation of his Fifth, Eighth, and Fourteenth Amendment rights.

■ ¶ 62 Trial counsel did not object to the first two witnesses—Hanlon and Archer. Both were first-responder EMTs and each testified about what he saw at the crime scene and described the victim's condition at that time. All but plain error with regard to the cumulative nature of this testimony is waived by trial counsel's failure to object. Admission of evidence is left to the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *See e.g. Williams v. State,* 2001 OK CR 9, ¶ 94, 22 P.3d 702, 724, *cert. denied,* 534 U.S. 1092, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002). Allowing two witnesses to testify about the murder scene and the victim's condition was not an abuse of discretion and we find no plain error.

¶ 63 When counsel did object to the third witness's description of the crime scene, the trial court acknowledged the testimony was somewhat cumulative and instructed the prosecutor to lay a brief foundation for introduction of the photographic evidence. Thereafter, the witness testified sufficiently to lay the foundation for photographic evidence, and certain photographic evidence was admitted.

■ ¶ 64 Coddington submits the trial court erred by allowing three witnesses to testify about the "same" thing and to allow the admission of photographic evidence depicting the information contained in the testimony. We disagree. When trial counsel objected, the trial court properly instructed the prosecutor to "lay a brief foundation" for the introduction of the photographic evidence. Thereafter, State's Exhibits 1, 3, 4, 23, 28 and 67 were identified and admitted into evidence *without* objection. The photographs were properly admitted during the testimony of Scott Cox and were not so cumulative or prejudicial as to be inadmissible and no error occurred. Accordingly, we will not find Coddington was prejudiced by cumulative testimony, or deprived of his fun-

---

**13.** The prosecution witnesses were EMTs Jeff Hanlon and Richard Archer, and police officer Scott Cox.

damental rights to a fair trial and due process of law.

¶ 65 In Proposition Seven, Coddington contends the State did not present sufficient evidence to sustain his conviction for First Degree Murder. Coddington specifically challenges the sufficiency of the State's proof on the element of malice aforethought. At trial, and now on appeal, Coddington submits he did not intend to kill Hale. He argues that all of the evidence of the element of malice aforethought was circumstantial and suggests that, under the reasonable hypothesis standard, the evidence was insufficient to exclude every reasonable hypothesis but guilt on this element.

¶ 66 In *Easlick v. State,* 2004 OK CR 21, ¶ 15, 90 P.3d 556, 559, we abandoned the "reasonable hypothesis" test and adopted a unified standard of review for direct and circumstantial evidence in claims of insufficient evidence. Prior to *Easlick,* we looked to the evidence as a whole in determining which standard of review to apply—not just the type of evidence offered in support of a single element. *Bland,* 2000 OK CR 11, ¶ 23, 4 P.3d at 713; *see also Davis v. State,* 2004 OK CR 36, ¶ 27, 103 P.3d 70, 79. Accordingly, we will review Coddington's claim challenging the sufficiency of the evidence by determining whether, in a light most favorable to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Spuehler v. State,* 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–204; *Easlick,* 2004 OK CR 21, ¶ 15, 90 P.3d at 559.

¶ 67 Hale's neighbors, Jeff Pence and Nathan Kirkpatrick, each testified he saw a gray Honda parked in Hale's driveway in front of the garage between 5:30 and 6:30 p.m. on the day Hale was murdered.[14] Kirkpatrick also testified he saw a white male driving the Honda. Greg Brewer, owner of the Honda Salvage Yard and Coddington's employer, testified that he loaned Coddington a 1984 gray Honda the day before Hale's murder. Former Oklahoma City police detective Robert Smart testified he and several other police officers recovered a "rough-in"

hammer from the place where Coddington said it would be—from a creek over the fence just west of Coddington's apartment. Former Oklahoma City police officer Glen Despain interviewed Coddington after his arrest at the police station. During the interview, after admitting to his involvement in a string of robberies, Coddington himself turned the conversation towards the homicide. Coddington confessed to killing Hale by hitting him in the head with the hammer. Coddington told officer Despain where the hammer was that he used to kill Hale; officer Despain was also among the officers who recovered the hammer from the location where Coddington said it would be. The Chief Medical Examiner for the State of Oklahoma testified that Hale died from blunt force head trauma—probably three or four blows to the head and also had defensive wounds on his hands. One skull injury suggested a direct blow and was in the shape of a cross.

¶ 68 At trial, Coddington's expert witness on symptoms of cocaine intoxication and addiction (Dr. Smith) said Coddington told him he knew he had done wrong by killing, admitted he hit Hale three or four times and took money from him when he realized what he had done. Dr. Smith testified he was able to describe the attack in great detail; he knew what clothes he wore, the denominations of bills he removed from Hale's pocket, and what part of the hammer he hit Hale with.

¶ 69 Coddington testified and admitted he went to Hale's house around 5:00 p.m. on March 5, 1997, intending to borrow money from Hale to buy more cocaine. He watched television with Hale for one and a half to two hours and smoked cocaine in Hale's bathroom during that time. Coddington testified Hale knew he was using, asked him what was wrong, and told him to get back into treatment. When Coddington asked Hale to borrow some money, he refused and told Coddington to leave. Coddington testified as he approached the door with Hale behind him, he saw a hammer on the dishwasher, grabbed it and hit Hale with the weapon.

14. Pence testified he saw the Honda parked there around 5:50 p.m.; Kirkpatrick testified he saw the car parked there between 5:30 and 6:30 p.m.

Although Coddington testified he did not go there intending to kill or harm Hale, he admitted on cross-examination that he struck Hale three times even though Hale was no threat after the first blow. He testified he did not call the police because he did not want to get caught.

¶ 70 The evidence in this case consisted of both circumstantial and direct evidence.[15] While Coddington denied having the intent to kill Hale, the circumstances surrounding his murder suggest it was committed with intent. Coddington attacked Hale after Hale refused to give him money for drugs. He hit Hale with the hammer three times; Hale had defensive wounds, and there was significant blood spatter. Malice, the deliberate intention to take the life of another without justification, may be formed in an instant. *Ullery v. State*, 1999 OK CR 36, ¶ 31, 988 P.2d 332, 347. "A design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed." 21 O.S.2001, § 702. This Court will accept all reasonable inferences and credibility choices that tend to support the verdict. *Bland*, 2000 OK CR 11, ¶ 24, 4 P.3d at 713. Here, the jury obviously did not find Coddington's denial of malice to be credible. In a light most favorable to the State, the evidence presented was sufficient for a rational trier of fact to find the essential elements of first degree murder beyond a reasonable doubt. *Spuehler, id.* Proposition Seven does not warrant relief.

### SECOND STAGE ISSUES

¶ 71 In Proposition Eight, Coddington argues he was deprived of the right to a constitutionally sound capital sentencing proceeding when the trial court precluded the admission of the videotaped statement of his mother. Prior to trial, the defense filed an Application to Take Testimony of Out of State Witness. Coddington sought a videotaped statement from his mother, Gayla Hood, to preserve her testimony for the second stage of trial.[16] At the time of the Application, Hood was incarcerated at the Federal Medical Center Penitentiary at Carswell Air Force Base in Fort Worth, Texas, suffering from serious heart problems which made death likely and imminent.

¶ 72 A hearing on the Application was held May 4, 2000. There, defense counsel Spradlin stated

... We wish to preserve her testimony in the event that she does pass away before our trial. And also in the event that if she is still living at the time of our trial, it is entirely possible her physicians would not let her travel because of her illness.

I have verified in the past, by speaking directly with her doctor, that she does, in fact, have a heart condition. She has had several heart attacks, several angioplasties. She has serious heart problems which are prevalent in the family ... So it is a serious issue at this point.

And she contacted me last week and expressed that she was no longer able to have any further operations. Her condition continued to deteriorate and her doctor informed her that her heart was just giving out.

So ... what we are asking to do is propound interrogatories ... provide a set ... to the prosecution and then they, in turn, would provide their cross-interrogatories to us. Then we would submit those interrogatories to the Court for approval.

And we would like to go to Ft. Worth to the Federal Medical Center at Carswell Air Force Base and take that testimony both by transcription and on videotape.

---

15. Coddington's own testimony constituted direct evidence of the crime as he admitted killing Hale. *See Hooks v. State*, 2001 OK CR 1, ¶ 8, f. 7, 19 P.3d 294, 305 (a defendant's testimony does not provide direct evidence of a crime unless he includes actual direct evidence of the crime).

16. In support of the Application, Coddington averred Hood was an "essential punishment state (sic) witness," would testify extensively about child abuse suffered by Coddington, suffered from cardiac failure and her condition was inoperable and deteriorating. Accompanying the Application was a Notice filed by defense counsel stating Hood's physician indicated during an interview that Hood was "surviving past any medical reason" and "could and will probably die very soon."

The trial court noted the attorneys had agreed to proceed through interrogatories and take a videotape and transcript of the interrogatories. "And then, at some point in time, if the State objects to the videotape we can argue that." Assistant District Attorney Lou Keel then stated "[t]he only disagreement, sir, we have got pertaining to the manner in which the testimony from this witness would be given to the jury at trial and whether follow-up questions to the interrogatories that are proposed will be appropriate...." The parties agreed to appoint a commissioner to consider the interrogatories to be submitted. Defense counsel filed interrogatories for the witness and provided copies of those interrogatories to the District Attorney. The State did not present any interrogatories prior to the examination.

¶ 73 Gayla Hood was examined by defense counsel and assistant District Attorney Marny Hill on June 8, 2000, at the Federal Medical Center Penitentiary in Ft. Worth, Texas. Judge Bass administered an oath to Hood—that her sworn testimony would be the truth, the whole truth and nothing but the truth—by telephone. Counsel then asked her the questions previously filed of record as interrogatories, and the State's attorney cross-examined her. Her oath and testimony was recorded on videotape.

¶ 74 On the fourth day of trial, the State filed a Motion in Limine to prohibit the defense from playing the videotape and sought an order requiring Hood's testimony be read to the jury if admitted at all. The State also requested the defense be required to redact "unresponsive answers." On the first day of second stage proceedings, Judge Bass heard lengthy arguments on the State's motion. The State, through assistant District Attorney Fern Smith, objected to the admissibility of Hood's testimony because it was "not in compliance with the law" and because it contained statements the State objected to. Defense counsels argued strenuously that Hood's answers to interrogatories had been videotaped pursuant to an agreed procedure, that everyone had notice of the interrogato-

ries, that representatives from both parties were present, that the witness was properly sworn, that the State cross-examined Hood, that both parties knew the intent of the videotape was to preserve Hood's testimony because of her poor health, and that no court reporter was present by agreement of the parties. Defense counsel Wilson also argued that laches precluded the State from such a late objection to the manner in which this testimony was preserved.

¶ 75 While the trial court noted the statutes dealing with conditional examinations of witnesses in criminal cases had "not kept up with the times by any stretch of the imagination," after reviewing the transcript of the May 4, 2000 hearing, it determined there was no agreement to play the videotape during the trial as the State had reserved "its objections to any portions of the admissibility of this statement." After redacting certain responses upon the State's request, defense counsels offered the original videotape, the redacted videotape and the original transcript into evidence and argued there was a "distinction with a difference between reading from a transcript and seeing someone's face and what they actually look like." The trial court admitted the videotapes for purposes of appeal only. Thereafter, Gayla Hood's responses to the interrogatories, recorded on the videotaped statement, were read into the record by defense counsel.

¶ 76 Coddington contends the trial court's decision to prohibit the playing of Hood's videotaped examination in its entirety based on strict adherence to the rules of evidence and to the procedures outlined at 22 O.S. 2001, §§ 781 *et. seq.* deprived him of due process of law and a reliable capital sentencing hearing, in violation of the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article II, § 7 of the Oklahoma Constitution. At a minimum, Coddington submits the redacted videotape should have been admitted and played for the jury.[17]

¶ 77 We agree. While the videotaped preservation of Hood's testimony did not strictly comply with the procedural require-

17. The videotapes, original and redacted, are contained in the appeal record as Defendant's Exhibits 25A and 25B.

ments set forth in 22 O.S.2001, § 781, *et. seq.*, the record below indicates the State agreed to the procedure to be utilized and only had not agreed on the manner in which it would be presented to the jury.[18] For the State to object almost three years later to the admission of the videotaped examination, because the strict procedures set forth in the statute referenced in the Application to Take Testimony of Out of State Witness were not followed in taking the statement, seems disingenuous. The State knew Coddington wanted and needed to preserve his mother's testimony for second stage mitigation evidence and we are not convinced by the prosecutor's eleventh hour claim that the State was not aware Coddington intended to offer the videotape rather than read the testimony.

¶ 78 Prosecutor Smith's argument that the applicable statutes only allowed for Hood's testimony to be read to the jury was not correct. The statutes referenced in the Application to Take Testimony of Out of State Witness, 22 O.S.2001, § 781 *et. seq.*, were adopted in 1910 and have not been amended since. The language of the statute dealing with how the "deposition" will be presented at trial only contemplates "reading", because there were no videotapes or recording devices in 1910. We note, however, the statute does not mandate the examination be read into the record. *See* 22 O.S.2001, § 793. ("Depositions taken under a commission *may* be read into evidence ...") As the trial court noted, these statutes have not kept up with the times by any stretch of the imagination.

¶ 79 The legislature has provided for the conditional examination of witnesses other than the non-resident material witnesses referenced in Section 781. Sections 761 through 771 of Title 22 also address depositions or the conditional examination of witnesses. These statutes contemplate those occasions where a witness is about to leave the state, a witness is incarcerated, or a witness is so sick or infirm that one could reasonably believe that the witness will be unable to attend the trial, and provide a

mechanism to obtain and preserve the testimony of that witness. The procedures set forth in 22 O.S.2001, §§ 761 *et. seq.* and 781 *et. seq.* both reflect the legislature's intent to provide a mechanism to obtain and preserve important testimony when the witness is or is anticipated to be unavailable at trial.

¶ 80 We note that the State's objection to the videotaped deposition was not based upon a claim that it was not a reliable preservation of the testimony. Rather, the State's objection was to the admissibility of Gayla Hood's testimony at all because the statute referenced in the motion was not followed.

¶ 81 Gayla Hood's videotaped examination should have been admitted. Having reviewed both the videotaped examination and the written examination, we note a compelling difference between seeing the witness testify to this valuable mitigation evidence and hearing someone read her testimony. Regardless of the statutory procedure for "commissions to take testimony outside state," under the facts of this case, the exclusion of the videotaped evidence constituted a violation of the Fourteenth Amendment. The exclusion of the videotaped examination was not based upon unreliability, but upon the strict application of an outdated statute dealing with reliable preserved testimony.

¶ 82 In *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973), the Court said "[t]he hearsay rule may not be applied mechanistically to defeat the ends of justice." What happened in this case is similar to the mechanistic application of the rules of evidence the Supreme Court condemned in *Chambers. See e.g. Green v. Georgia,* 442 U.S. 95, 97, 99 S.Ct. 2150, 2151–2152, 60 L.Ed.2d 738 (1979)(exclusion of proffered reliable testimony which was highly relevant constituted a violation of due process and denied petitioner a fair trial on issue of punishment).

¶ 83 In *Warner v. State,* 2001 OK CR 11, ¶ 15, 29 P.3d 569, 575, this Court recognized the importance of a mother's testimony as mitigating evidence in a capital trial. "[T]he Constitution requires individualized sentenc-

---

**18.** At the hearing in May of 2000, the assistant prosecutor reserved objections relating to the manner in which the testimony would be given

the jury; any objection to "procedure," such as lack of a court reporter or otherwise should have been made at that time.

ing, and mitigation evidence is an important factor in insuring this right." *Warner, id., quoting Fitzgerald v. State,* 1998 OK CR 68, ¶ 41, 972 P.2d 1157, 1173, *citing Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). In *Warner,* we found defense counsel ineffective for failing to follow the statutorily mandated procedure for requesting a continuance in order to secure the defendant's mother's presence for second-stage testimony. *Id.,* 2001 OK CR 11, ¶ 16, 29 P.3d at 575. Because counsel did not comply with the statute, his request for continuance was denied and he was forced to present this valuable mitigation witness's testimony in the form of a five sentence stipulation. *Id.* at ¶ 15, f. 10, 29 P.3d at 575.

¶ 84 In this case, while Coddington was not denied the opportunity to present his mother's testimony in written form, the jury was denied the opportunity to actually see and hear the witness when such nearly live testimony was available. The jury was denied the opportunity to judge this witness's demeanor and assess her credibility.

¶ 85 Courts routinely note the general preference for live testimony. For example, in cases where the declarant is unavailable, former sworn testimony is admitted as a substitute for live testimony because no better version of the evidence exists. *See United States v. Inadi,* 475 U.S. 387, 394, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)(general preference for live testimony noted); *State v. Nobles,* 357 N.C. 433, 437, 584 S.E.2d 765, 769 (N.C.2003)(when two versions of the same evidence are available, longstanding principles of the law of hearsay favor the better evidence). It is apparent from reading the record that the trial court found Hood's examination testimony to be sufficiently reliable and admissible mitigation evidence; it simply did not admit the videotaped examination because the State insisted the statute required it to be read.

¶ 86 The best evidence, in this case, was Hood's videotaped examination, not a reading of her testimony. *See* 12 O.S.2001, § 3002. Videotaped confessions, rather than confessions in written form, are regularly admitted to show the jury the demeanor of a person and the circumstances under which confessions are made. Just as this Court determined in the 1950s that wire recordings and talking motion pictures were so common in use that the verity of their recordings and sounds were established enough to allow recorded confessions to be admissible rather than requiring admissibility of the transcription, *see Williams v. State,* 93 Okla.Crim. 260, 270, 226 P.2d 989, 995 (1951), we now hold that under the conditional examination statutes at issue in this case, set forth at 22 O.S.2001, §§ 781, *et. seq.* and set forth at 22 O.S.2001, §§ 761, *et. seq.,* when the examination of the person is conducted under such circumstances which show the recording is reliable, the actual videotaped examination may be received into evidence and viewed by the jury rather than read to the jury.

... [I]n keeping with the policy of the courts to avail themselves of each and every aid of science for the purpose of ascertaining the truth, such practice is to be commended as of inestimable value to triers of fact in reaching accurate conclusions.

"This particular case well illustrates the advantage to be gained by courts' utilizing modern methods of science in ascertaining facts. ... When a confession is presented by means of a movietone the trial court is enabled to determine more accurately the truth or falsity of such claims and rule accordingly."

*Williams,* 93 Okla.Crim. at 270, 226 P.2d at 995, *quoting People v. Hayes,* 21 Cal.App.2d 320, 71 P.2d 321, 322.

¶ 87 While the jury heard this important mitigation testimony, it was wrongly prohibited from seeing this valuable witness. The humanizing effect of live testimony in the form of a mother testifying for her son as mitigation evidence in a capital murder trial cannot seriously be disregarded as irrelevant. *See e.g. Solomon v. State,* 49 S.W.3d 356, 366 (Tex.Crim.App.2001)(recognizing humanizing effect of live testimony); *People v. Enis,* 194 Ill.2d 361, 414, 743 N.E.2d 1, 30, 252 Ill.Dec. 427, 456 (Ill.2000)(noting live testimony of the affiants would have had more complete portrayal of the defendant). Coddington knew his mother would be unable to give live testimony on his behalf due to her extremely ill

health and arranged for the next best thing—a videotaped examination while she was alive.

¶ 88 Civil courts in Oklahoma recognize the value of videotaped depositions. *See e.g. B-Star, Inc. v. Polyone Corporation*, 2005 OK 8, ¶ 17, 114 P.3d 1082, 1086 ("This Court understands that video presentation of evidence is a convenient and cost-effective tool."); *see also* 12 O.S.Supp.2004, § 3232(C). "The utilization of videotape is nothing more than an updated visual version of preserving testimony." *Inhofe v. Wiseman*, 1989 OK 41, ¶ 7, 772 P.2d 389, 392. The fact finder "at trial often will gain greater insight from the manner in which an answer is delivered and recorded by audio-visual devices. Moreover, a recording, a video tape, or motion picture of a deposition will *avoid the tedium* that is produced when counsel read lengthy depositions into evidence at trial." *Carson v. Burlington Northern, Inc.*, 52 F.R.D. 492, 493 (D.Neb.1971)(emphasis added), *citing* 8 Wright & Miller, Fed. Practice and Procedure 426 (1970). Here, while the statute contemplated reading the preserved examination testimony into the record, the legislature did not make "reading" the examination mandatory in its conditional examination statutes. 22 O.S.2001, §§ 770, 793 (statutes use the word "may" rather than "shall"). The trial court should have allowed the videotaped examination to be seen and heard by the jury; it was well within the trial court's discretion to allow the jury to experience her testimony in that form. 12 O.S. 2001, § 2402 (all relevant evidence is generally admissible).

¶ 89 We afford great deference to jurors' determinations of witness credibility due to their unique ability to personally observe the demeanor of the witnesses at trial. *See Scott v. State*, 1995 OK CR 14, ¶ 15, 891 P.2d 1283, 1291; *Stanberry v. State*, 1981 OK CR 156, ¶ 12, 637 P.2d 892, 896. Personal observation of a significant mitigation witness would allow the jury to judge that witness's demeanor and aid in determining that witness's credibility and value as a mitigation witness. The "tedious" reading of Hood's testimony into the record hardly afforded Coddington's jury that opportunity in this case.

¶ 90 The sentencer in capital cases should not be precluded from considering any relevant mitigating evidence. *Skipper v. South Carolina*, 476 U.S. 1, 8, 106 S.Ct. 1669, 1673, 90 L.Ed.2d 1 (1986). Hood's videotaped examination showed her demeanor—it showed her distress and sadness she had for her son in a way that the cold reading of a transcript could not portray. The witness's demeanor in this case is exactly the type of evidence that might invoke sympathy for a defendant facing the death penalty. Sympathy is proper for the jury to consider in assessing punishment. *See Salazar v. State*, 1998 OK CR 70, ¶ 42, 973 P.2d 315, 328. Prohibiting the jury from receiving evidence in the form likely to invoke sympathy and achieve the purpose of this mitigation witness was improper. *See Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). We cannot determine how the jury would have viewed Hood's testimony if it had actually seen her videotaped examination. However, the potential error would be of constitutional magnitude. The only proper remedy is to remand for a new sentencing hearing with an instruction that the new jury specifically be allowed to see Hood's videotaped examination.

¶ 91 The error identified in Proposition Fourteen also warrants discussion and contributes to our decision to reverse Coddington's sentence of death and remand for resentencing. In Proposition Fourteen, instructional error in the sentencing phase allowed the jury to disregard relevant mitigating evidence in violation of *Lockett v. Ohio* and its progeny. Upon the State's request, the trial court gave the Oklahoma Uniform Jury Instruction on impeachment of witness by former conviction. *See* OUJI–CR 2d. 9–22. Specifically listed in that instruction were defense witnesses Gayla Hood, Mike Hood, Tommy Coddington, Walter "Duffy" Coddington, Ricky Coddington, and Kathy Johnson. Coddington relied upon these family witnesses and their own troubles with the law and addiction to help explain Coddington's background, addiction, and criminality. Defense counsel did not object to this in-

struction. The trial court's decision to give the impeachment instruction as it related to his family mitigation witnesses effectively recharacterized their testimony as impeachment evidence and precluded the sentencer from properly considering their testimony. We find plain error.

¶ 92 In *Lockett*, 438 U.S. at 604, 98 S.Ct. at 2964–65, the Supreme Court concluded "that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Here, the purpose the family witnesses during second stage was to show how Coddington came from a bad background where his family members were drug addicts and criminals. Contrary to the State's response, such evidence might be perceived as facts about Coddington's background that would call for a penalty less than death. This instruction might have led the jury to believe the evidence of these witnesses' prior convictions was offered for impeachment purposes and was not offered to explain Coddington's background. To that extent, under the facts presented here, the instruction might have prevented the jury from considering relevant mitigating evidence. *See Williams*, 2001 OK CR 9, ¶ 104, 22 P.3d 702, 726.

¶ 93 In *Williams*, we found any error in the language of the instruction did not have a substantial impact on the outcome of second stage proceedings. *Id.* Here, we cannot so find. This error, in conjunction with the error identified in Proposition Eight, requires Coddington's death sentence be vacated and the case remanded for a new sentencing proceeding.

¶ 94 Because our remand for resentencing renders moot all other challenges to the second stage proceedings, the remaining propositions raising errors alleged to have occurred in the sentencing stage of trial need not be addressed. However, in Proposition Twenty, Coddington argues he received ineffective assistance of counsel in both stages of trial. Because we remand for resentencing, those complaints about counsel's second stage performance are moot. What remains is Coddington's complaints that his attorneys failed to make timely, specific objections, request admonishments or mistrial or take other appropriate action to preserve the issues raised in Propositions Three and Five.

¶ 95 To prevail on a claim of ineffective assistance of counsel, an appellant must show (1) that counsels' representation fell below an objective standard of reasonableness and (2) the reasonable probability that, but for counsels' errors, the results of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

¶ 96 Review of this record, in its entirety, shows two well-prepared, competent capital trial litigators represented Coddington. In Proposition Three, we found that trial counsel's failure to request that Juror Muller be removed and replaced by an alternate juror was likely a matter of trial strategy and Coddington had not established his counsel's conduct constituted deficient performance. *Strickland, id.; Woodruff v. State*, 1993 OK CR 7, ¶ 16, 846 P.2d 1124, 1133, *cert. denied*, 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993) (this Court does not evaluate performance in hindsight). We reviewed the claims relating to Ron Hale raised in Proposition Five for plain error and determined no error warranting relief occurred. Had trial counsel imposed timely objections to the complained of testimony, the trial court might have admonished the jury to disregard the evidence. However, while objections to Hale's testimony might have been sustained and the jury admonished, we do not believe trial counsel's objections would have altered the outcome of the first stage proceedings and Coddington cannot show prejudice. *Humphreys v. State*, 1997 OK CR 59, ¶ 40, 947 P.2d 565, 578 (to show prejudice, an appellant must show a reasonable probability that but for counsel's errors the outcome of the proceeding would have been different). Failure to prove prejudice is fatal to Coddington's ineffective assistance of counsel claim. *Dodd v. State*, 2004 OK CR 31, ¶ 112, 100 P.3d 1017, 1049.

## DECISION

¶ 97 For the reasons set forth in this Opinion, Coddington's conviction and sentence for First Degree Robbery, in Oklahoma County District Court, Case No. CF 97–1500 (Count 2) is *AFFIRMED;* Coddington's conviction for First Degree Murder (Count 1) is *AFFIRMED,* but his sentence of death is *REVERSED AND REMANDED TO THE DISTRICT COURT FOR RESENTENCING.*

CHAPEL, P.J., and A. JOHNSON, J.: concur.

LUMPKIN, V.P.J.: concurs in part/dissents in part.

LEWIS, J.: specially concurs.

LUMPKIN, Vice–Presiding Judge: Concur in Result/Dissent in Part.

¶ 1 I concur in the results reached in this case, but dissent in part. My vote is based upon the following reasons.

¶ 2 First, I cannot agree with the confusing analysis used concerning proposition four, i.e., expert testimony on the ultimate issue. The opinion's discussion of this issue and paraphrased summaries of *White v. State,* 1998 OK CR 69, 973 P.2d 306 and *Hooks v. State,* 1993 OK CR 41, 862 P.2d 1273 use dangerous wordplay that could dilute the applicable law. Paragraphs 9 through 11 of my specially concurring opinion in *White* provide a more thorough explanation of the applicable rules, rules that fully comply with the American Bar Association Standards for Criminal Justice.

¶ 3 For purpose of clarity, I reiterate here that Standard 7–6.6 of the *American Bar Association Criminal Justice Mental Health Standards* provides that "[o]pinion testimony, whether expert or lay, as to whether or not the defendant was criminally responsible at the time of the offense charged should not be admissible." Furthermore, the commentary to that standard provides that an "expert witness should not be permitted to express opinions on any question requiring a conclusion of law or a moral or social value judgment properly reserved to the court or to the jury." And later, that same commentary indicates that "[t]erms like *premedita-*

*tion, malice,* and *provocation* have technical legal meanings concerning which mental health or mental retardation professionals can pretend no expertise."

¶ 4 Accordingly, I have no qualms with the trial court's *in limine* ruling that prevented the defense expert from testifying as to Appellant's inability to develop the requisite *mens rea.* That issue was ultimately for the jury to decide. In addition, psychological testimony is totally subjective and not provable with objective evidence. It is educated speculation at best. For that reason, we have previously limited such testimony to educating the jury regarding the nature of the proffered mental health issue from which the jury could then render its decision based on the facts of the crime. In this case, Appellant's ability to remember and relate the facts of the crime carry great weight in disproving that proffered opinion. In addition, Appellant admitted he knew what he had done and it was wrong.

¶ 5 Second, concerning the victim photograph issue raised in proposition five, the Court seems to abandon the clear legislative intent of 12 O.S.Supp.2002, § 2403 by applying the old rule applicable to such photographs, prior to 2002 amendments. The statutory amendment plainly means that a victim's photo is definitely admissible in a criminal homicide prosecution so long as it is an accurate representation of the victim at the time of the death and is not an attempt to play on the sympathy or sentiment of the trier of fact. The plain language of the current statute is clear and the Court should not employ an overall relevance balancing test under the former version of the statute.

¶ 6 Third, I agree with the opinion that the videotape of the mother should have been admitted. But I agree *only* because of the agreement of the parties and the fact the State made no objection to the use of the videotape at the time the agreement was made. There is nothing unconstitutional about Oklahoma's statutory method for preserving witness testimony. There may be more modern ways to preserve such testimony, but that does not make the statute unconstitutional. Until the statute is changed we

are bound to follow the statute even if the process is antiquated.

¶ 7 This Court has recently emphasized the importance of following a statutory provision even to the point it can be a structural error in a trial. *See e.g., Golden v. State,* 2006 OK CR 2, 127 P.3d 1150. But now the Court wants to brush away statutory provisions because it has conceived of new ways that might be better. This, of course, leads to inconsistencies. I cannot join in a result-oriented jurisprudence designed to ensure mothers always get to testify. Regardless of who they are, witnesses must comply with rules established by the Legislature. It seems the Court only wants to view statutes with the weight of "structural error" if the use of that view impedes the state.

¶ 8 I agree the Legislature should update our statutes on preserving witness testimony. But until the Legislature does, this Court is without authority to amend statutes. We can only interpret them and determine if they are Constitutional.

¶ 9 Fourth, there is no reason not to impeach family members who are offering mitigating evidence. *See* OUJI–CR 2d. 9–22. We cannot provide a defendant's family members a safe haven that deprives the triers of fact the truth of their own prior illegal activates. It is for the trier of fact to decide the credibility of the witnesses, and the trier of fact must be informed of the witnesses' character to make an informed finding.

LEWIS, Judge, Specially Concurs.

¶ 1 I agree with the State that parts of the testimony by the defendant's mother should have been redacted; however, I concur with the opinion that prohibiting the defendant from playing the videotaped testimony to the jury denied the defendant relevant mitigating evidence.