**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 25 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EBERARDO VALDEZ, also known as
EBERARDO LALO VALDEZ,

　　　　　Petitioner-Appellee,

　　v.

ERASMO BRAVO, Warden,
Guadalupe County Correctional
Facility; ATTORNEY GENERAL
FOR THE STATE OF NEW MEXICO,

　　　　　Respondents-Appellants.

No. 03-2102

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. CIV-01-334-MV)**

---

Max Shepherd, Assistant Attorney General (Patricia A. Madrid, Attorney General,
with him on the briefs), Albuquerque, New Mexico, for Respondents-Appellants.

Roger A. Finzel, Assistant Federal Public Defender, Albuquerque, New Mexico,
for Petitioner-Appellee.

---

Before **LUCERO** , **McCONNELL** , and **TYMKOVICH** , Circuit Judges.

---

**TYMKOVICH** , Circuit Judge.

---

In this habeas case, the United States District Court for the District of New Mexico granted relief to petitioner Eberardo Valdez under 28 U.S.C. § 2254 (2000), ruling that the evidence was insufficient to support his conviction as an accessory to second-degree murder. The government appeals. Exercising jurisdiction pursuant to 28 U.S.C. § 2253, we reverse the district court's grant of habeas relief.

## I. BACKGROUND

Around midnight on January 16, 1998, five men gathered at the home of Jerrold Campos in Carlsbad, New Mexico. The group consisted of Campos and his brother, their cousin Ruben Garcia, the petitioner Eberardo Valdez, and one other man. While there, Campos told Valdez he was mad because "some black guys" had jumped his cousin earlier in the week. According to Valdez, Campos then said he was going to a "get together" in a mobile home park where there might be some "chinagasos," or fisticuffs. Valdez followed Campos and the others to the mobile home park in his truck. Valdez later admitted to police that he knew "something was going down" and that he had gone along to "back up" Campos.

When the five men arrived, they charged into the mobile home where the victim, Kendrick Rudolph, lay asleep in a bedroom and Rudolph's friend, Carl Smith, was asleep in a living room chair. Campos and his companions initially

began attacking Smith. Hearing the commotion, Rudolph came out of the bedroom; when the men turned their attention toward him, Smith was able to break free and run to the rear of the house. At this point, Valdez chased Smith out the mobile home's back door and into the side yard, where the two men proceeded to fight.

Around the same time, the other four men pursued Rudolph out the front door of the mobile home. The record shows that the front and rear doors were on the same side of the house. Witnesses testified that the men pinned Rudolph up against a neighbor's mobile home and began to brutally beat him. Rudolph's girlfriend, Ashley Melendrez, who had been in the bedroom with Rudolph prior to the attack, followed the men outside and tried to stop the fight. She testified that as she tried to pull Rudolph's attackers off of him she saw a knife in one of their hands and she saw blood. Melendrez was stabbed in the arm in the process of trying to help Rudolph. The record shows that the assault on Rudolph took place approximately thirty feet from where Valdez and Smith were fighting, and that the two areas were separated only by a chain link fence.

The fight between Valdez and Smith ended with Valdez knocking Smith to the ground and kicking him at least one time in the head. Meanwhile, the other four men had apparently dragged Rudolph back inside the house where they continued to stab and beat him. When Valdez heard police sirens approaching, he

3

rushed back into the house to inform the others that "5-0" was coming. While inside, he saw Garcia hit Rudolph over the head with a VCR as Rudolph lay bleeding on the ground. An examination of Valdez's shoes would later reveal that he stepped in some of Rudolph's blood before leaving.

Following Valdez's warning, the five attackers fled the scene. Police and paramedics arrived at the mobile home park a short time later and Rudolph, who had been stabbed fifty-four times by Campos, was pronounced dead. In the course of fleeing from the crime scene, Valdez crashed his vehicle into a ditch and took off through fields on foot, eventually making it back to his house. The next morning Valdez reported that his vehicle had been stolen, but later admitted that this was a lie after his girlfriend told police that Valdez was not with her at the time of the murder.

Valdez was charged with an open count of murder in state district court. A jury found him guilty of being an accessory to the second-degree murder of Rudolph in October 1998, and he was subsequently sentenced to fifteen years in prison. On direct appeal Valdez argued that there was insufficient evidence to support his conviction and that the district court erred in instructing the jury on felony murder. In 1999, the New Mexico Court of Appeals (NMCOA) affirmed. In doing so, the NMCOA found:

> The stabbing took place both inside and outside the
> trailer. This is significant because Defendant was

4

fighting with Smith outside of the trailer and therefore should have been cognizant of the fact that Rudolph was being stabbed repeatedly.

. . . .

The jury could reasonably have found that Defendant and his companions went to Rudolph's residence with the intention of engaging in a fight with Rudolph and Smith. In fact, Defendant admitted participating in the attack on Smith and warned the others when the police were arriving. This is sufficient for the jury to infer that Defendant intended that the attack on Rudolph be committed and that he helped, encouraged, or caused the attack to be committed.

*New Mexico v. Eberardo "Lalo" Valdez*, No. 19-903, slip op. at 7-8 (N.M. Ct. App. Nov. 22, 1999) (NMCOA opinion). The New Mexico Supreme Court denied certiorari.

After Valdez was denied state habeas corpus relief, and the denial was affirmed on appeal, Valdez filed this petition for federal habeas relief pursuant to 28 U.S.C. § 2254. In the district court he renewed his sufficiency of the evidence and felony murder instruction claims. A magistrate judge considered Valdez's claims on the merits and recommended that his petition be denied.

After considering Valdez's objections to the magistrate's recommendation, the district court remanded the matter to the magistrate judge for reconsideration of the sufficiency of the evidence and felony murder instruction claims. The magistrate judge again recommended that the petition be denied and the case be dismissed with prejudice.

5

The district court considered Valdez's objections to this recommendation and entered an order granting habeas relief on the sufficiency of evidence claim. *See* No. CIV-01-334-MV/RLP (D. N.M. Mar. 20, 2003) (Order). The salient findings of the district court are as follows:

> In determining that Petitioner's conviction was supported by sufficient evidence, the NMCOA placed great reliance on a "fact"--namely, that the stabbing of Rudolph took place both inside and outside the trailer-- that is not established in the record. The NMCOA relied on this "finding" to conclude that Petitioner had the requisite intent because, according to the court, petitioner "should have been aware that Rudolph was being stabbed repeatedly."
> . . .
> However, once that "fact" is removed from consideration, Petitioner's conviction rests on quicksand. There was no evidence in the record of any agreement or understanding that a murder would take place. There was no evidence that Petitioner even knew his companions had a knife. There was no evidence that Petitioner had any knowledge of what was taking place inside the home while he was outside.
> . . .
> There is simply no evidence in this case that Petitioner associated himself with or sought to bring about the murder of Kendrick Rudolph. By any measure, the NMCOA's affirmation of Petitioner's conviction-- particularly in light of the weight that court gave to matters nowhere in the record--is not merely, incorrect, but is unreasonable as understood by the *Williams* Court.

*See* Order at 3-4 (relying on *Williams v. Taylor*, 529 U.S. 362 (2000)). The district court subsequently entered an order barring the state from retrying Valdez on double jeopardy grounds. This appeal followed.

6

## II. DISCUSSION

### A. Standards of Review

#### 1. *AEDPA*

Valdez's habeas petition is governed by the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C. § 2254. Under § 2254(d), a federal court may not grant habeas relief on a claim adjudicated on the merits in state court unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"A state court decision is contrary to clearly established federal law under section 2254(d)(1) 'if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" *Mitchell v. Gibson*, 262 F.3d 1036, 1045 (10th Cir. 2001) (citing *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). "A state court decision is an unreasonable application of federal law under section 2254(d)(2) 'if the state court identifies the correct governing legal principle from [the Supreme Court's]

7

decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* "The Supreme Court has cautioned 'that an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.'" *Id.* (emphasis original).

## 2. *Sufficiency of the Evidence*

"A district court decision setting aside a jury verdict of guilty is entitled to no deference on appeal, and we review that determination de novo." *Wingfield v. Massie*, 122 F.3d 1329, 1331-32 (10th Cir. 1997). The standard of review, as enunciated by the Supreme Court, is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).[1] This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* Under *Jackson*, our review is "sharply limited." *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996). A court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such

---

[1] Although the New Mexico Court of Appeals did not cite to *Jackson*, the sufficiency of the evidence standard it applied was identical to the Supreme Court's formulation. *See* NMCOA opinion at 5.

conflicts in favor of the prosecution, and must defer to that resolution. *Id.* The court may not weigh conflicting evidence or consider the credibility of witnesses, but must accept the jury's resolution of the evidence as long as it is within the bounds of reason. *Id.*

B. Sufficient Evidence Exists to Support Valdez's Conviction

In applying the *Jackson* standard, we look to New Mexico law to determine the substantive elements of the relevant criminal offense. *See Wingfield*, 122 F.3d at 1332. The New Mexico second-degree murder statute provides that "a person who kills another human being without lawful justification or excuse commits murder in the second degree if in performing the acts which cause the death he knows that such acts create a strong probability of death or great bodily harm to that individual or another." N.M. Stat. Ann. § 30-2-1(B) (1978). Additionally, "[a] person may be charged with and convicted of the crime as an accessory if he procures, counsels, aids or abets in its commission," even though he did not directly commit the crime. N.M. Stat. Ann. § 30-1-13 (1994). The New Mexico Uniform Jury Instructions provide that a defendant may be found guilty as an accessory if the government proves: "(1) the defendant intended that the crime be committed; (2) the crime was committed; and (3) the defendant helped,

9

encouraged or caused the crime to be committed." UJI 14-2822 NMRA 2000.[2]

The New Mexico Supreme Court has held that an accessory must share the criminal intent of the principal. *See New Mexico v. Carrasco*, 1997-NMSC-047, ¶ 7, 946 P.2d 1075, 1079 (citing *New Mexico v. Ochoa*, 72 P.2d 609 (1937)). "This intent can be inferred from behavior which encourages the act or which informs the confederates that the person approves of the crime after the crime has been committed." *Id.* Furthermore, evidence of aiding and abetting

> may be as broad and varied as are the means of communicating thought from one individual to another; by acts, conduct, words, signs, or by any means sufficient to incite, encourage or instigate commission of the offense or calculated to make known that commission of an offense already undertaken has the aider's support or approval.

*New Mexico v. Salazar*, 78 N.M. App. 329, 331, 431 P.2d 62, 64 (1967) (citation omitted).

However, "mere presence at the scene of crime without some outward manifestation of approval is insufficient." *Id.* Moreover, "a jury must find a

---

[2] New Mexico has adopted the Model Penal Code definition of accessory liability. *See New Mexico v. Carrasco*, 1997-NMSC-047, ¶ 18, 946 P.2d 1075, 1081. Under the Model Penal Code, a person is an accomplice of another person in the commission of the offense if: "(a) with the purpose of promoting or facilitating the commission of the offense, he (i) solicits such other person to commit it, or (ii) aids or agrees or attempts to aid such other person in planning or committing it . . . ." *Id.* (citing Model Penal Code § 2.06(3) (Official Draft and Revised Comments 1962)).

community of purpose for *each* crime of the principal. This principle means that a jury must find that a defendant *intended* that the acts necessary for *each* crime be committed." *Carrasco*, 1997-NMSC-047, ¶ 9, 946 P.2d at 1079 (emphasis original).[3] Whether the alleged aider and abettor shared the principal's criminal intent is a question of fact for the jury and may be inferred from the circumstances. *See New Mexico v. Riley*, 480 P.2d 693, 694 (1971); *Ochoa*, 72 P.2d at 618.

After reviewing the record and proceedings below, we conclude that the evidence is constitutionally sufficient to support a finding of accessory liability in this case. The testimony viewed in the light most favorable to the prosecution establishes the following facts: Valdez and his companions went to Rudolph's mobile home with the intention of fighting; Valdez willingly drove to the mobile

---

[3] The Model Penal Code recognizes the following limit to accomplice liability:

> One who solicits an end, or aids or agrees to aid in its achievement, is an accomplice in whatever means may be fairly employed, insofar as they constitute or commit an offense fairly envisaged in the purposes of the association. But when a wholly different crime has been committed, thus involving conduct not within the conscious objectives of the accomplice, he [or she] is not liable for it . . . .

*See Carrasco*, 1997-NMSC-047, ¶ 17, 946 P.2d at 1081 (citing Model Penal Code § 2.06 cmt. 6(b)) (alteration in original).

home in his own vehicle; Valdez broke through the front door with the other four men and attacked Smith as he slept in a chair; Valdez fought Smith outside the back door of the house while his four companions attacked Rudolph; Valdez then reentered the mobile home and warned the others as the police arrived; Valdez's actions prevented Smith from assisting Rudolph.

Based on the foregoing, a jury could reasonably have inferred that Valdez intended the attack on Rudolph and that Valdez aided and encouraged Jerrold Campos in committing acts that created "a strong probability of death or great bodily harm" to Rudolph. The record reveals that Valdez knew there would be a fight because Campos had told him there would be some "chinagasos" at the mobile home park. Valdez also knew Campos was angry because some men had jumped his cousin. In fact, Valdez later admitted to police that he went to the mobile home to "back up" Campos. Furthermore, by keeping Smith from coming to the aid of the greatly outnumbered Rudolph, a jury could reasonably have inferred that Valdez not only intended to aid the initial attack on Rudolph, but also the ongoing assault that resulted in his death.

Nonetheless, the district court overturned Valdez's state conviction based on a perceived lack of intent evidence.[4] As noted above, the district court found

---

[4] The district court stated that, in finding the requisite intent, "the NMCOA placed great reliance on a 'fact'--namely, that the stabbing of Rudolph took place

(continued...)

that "[t]here was no evidence in the record of any agreement or understanding that a murder would take place. There was no evidence that Petitioner even knew his companions had a knife." Order at 3. From this the court concluded "[t]here is simply no evidence in this case that Petitioner associated himself with or sought to bring about the murder of Kendrick Rudolph." *Id.*[5]

In this regard, Valdez argues that even if sufficient evidence exists showing that he intended the assault on Rudolph, there is insufficient evidence in the record to establish that he intended Rudolph's death. However, in *New Mexico v.*

---

[4](...continued)
both inside and outside the trailer--that is not established in the record." Order at 3. However, witness Ashley Melendrez's testimony contravenes this finding. Melendrez testified that Rudolph "took the fight outside" where three of the attackers pinned him up against the next door trailer. She testified that she initially thought the men were just hitting Rudolph, but when she tried to pull them off him she saw blood and a knife. She also stated that she was stabbed in the arm when she tried to lay on top of Rudolph to protect him. [Tape 8, 7.9-9.9]. Thus, record evidence exists to support the NMCOA's finding that "the stabbing took place both inside and outside the trailer," and Valdez concedes as much on appeal. *See* Appellee Br. at 22-23 ("Mr. Valdez agrees with the State . . . that the U.S. District Court was mistaken in finding no evidence that Rudolph was stabbed outside the trailer.").

This conclusion in turn makes plausible the NMCOA's observation that Valdez "therefore should have been cognizant of the fact that Rudolph was being stabbed repeatedly." NMCOA opinion at 7. Our own review of the crime scene video tape submitted as Trial Exhibit SX-8 confirms that the jury could reasonably have inferred Valdez was in a position from which he could see the stabbing occur.

[5] The district court found that Valdez "did not enter the home until police had arrived . . . ." *See* Order at 2. However, there is testimonial evidence that Valdez entered Rudolph's mobile home soon after the five men pulled up to the house. [Tape 9, 35.6-35.8].

13

*Ochoa*, the New Mexico Supreme Court set forth a plain rule: "The intent to kill, or to aid and abet in the commission thereof, may be formed at the scene of the crime, even though the accused may have gone there without such intention." 72 P.2d at 617. The court thus held that where a participant in a group fight, though free from felonious intent at the beginning of combat, realizes that another member of his party is employing a deadly weapon, he may be guilty of sharing the other person's intent and hence become an aider and abettor if he continues to participate. *See id.* at 618. In these circumstances the participant "exposes himself to an inference of sharing the latter's intent." *Id.* In interpreting *Ochoa*, the New Mexico Supreme Court later explained that "intent can be inferred from behavior which encourages the act *or* which informs the confederates that the person approves of the crime *after* the crime has been committed." *Carrasco*, 1997-NMSC-047, ¶ 7, 946 P.2d at 1079 (emphasis added).

Here, Valdez reentered the trailer after fighting with Smith and warned Campos and the others that the police were arriving. While in the living room he witnessed Garcia hit Rudolph over the head with a VCR and also saw that Rudolph was covered with blood. [Tape 16, 28.1 to end]. Combined with the fact that the Valdez-Smith fight occurred only a short distance from where Rudolph was being stabbed outside, a jury could have reasonably inferred that Valdez realized another member of his party was employing a deadly weapon. A

14

jury could also have reasonably inferred that Valdez approved of this fact because he continued to participate in the altercation despite this knowledge.

Valdez's actions after the stabbing provide support for this inference. Instead of attempting to render aid to the victim or dissociate himself from his companions, Valdez left with the other attackers, fled from the police in his vehicle, and later falsely reported that his vehicle had been stolen. [Tape 16, 28.1 to end]. Therefore, in our view, even if Valdez went to the trailer with the intention of only committing assault, a jury could have reasonably inferred that his subsequent conduct affirmed an intent to aid or abet second degree murder. Moreover, such a resolution of the evidence is surely "within the bounds of reason." *Messer*, 74 F.3d at 1013.

### III. CONCLUSION

In sum, we conclude that sufficient evidence was presented at trial from which a jury could have inferred that Valdez shared a community of purpose with Campos. Therefore, sufficient evidence existed to support Valdez's conviction as an accessory to second-degree murder under *Carrasco*. Accordingly, we hold that the NMCOA's decision was not an unreasonable application of federal law, and REVERSE the judgment of the district court granting Valdez habeas relief.[6]

---

[6] The Stipulated Motion to Supplement the Record With Exhibits Admitted in the State Trial Court, filed October 22, 2003, is granted.

15