FILED
United States Court of Appeals
Tenth Circuit

May 12, 2020

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JAMES CODDINGTON,

      Petitioner-Appellant,

v.

TOMMY SHARP, Warden, Oklahoma
State Penitentiary,[*]

      Respondent-Appellee.

No. 16-6295

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 5:11-CV-01457-HE)**
_____

John T. Carlson, Ridley, McGreevy & Winocur P.C., Denver, Colorado (Seth A. Day, Hall Estill P.C., Oklahoma City, Oklahoma, with him on the briefs), for Petitioner-Appellant.

Caroline E.J. Hunt, Assistant Attorney General (Mike Hunter, Attorney General of Oklahoma, with her on the brief), Oklahoma City, Oklahoma, for Respondent-Appellee.
_____

Before **LUCERO**, **MORITZ**, and **EID**, Circuit Judges.
_____

**EID**, Circuit Judge.

_____

[*] Pursuant to Fed. R. App. P. 43(c)(2), Mike Carpenter is replaced by Tommy Sharp as the Warden of the Oklahoma Department of Corrections.

Petitioner James Coddington seeks collateral review of the Oklahoma Court of Criminal Appeals' (OCCA) resolution of his constitutional challenges to his conviction and sentence. Coddington argues that the trial court deprived him of his constitutional right to present a defense when it refused to allow his expert to testify that he was unable to form the requisite intent for malice murder. He also argues that his confession to the murder should have been suppressed because he did not knowingly and voluntarily waive his *Miranda* rights. The OCCA denied relief, and, applying AEDPA deference, the district court below did the same. For the reasons set forth below, we affirm the district court's denial of Coddington's petition because Coddington has failed to show that the OCCA's rejection of his challenges involved an unreasonable application of federal law.

I.

In March of 1997, Coddington, who had a history of cocaine use, relapsed and began using cocaine again. *Coddington v. State*, 142 P.3d 437, 442 (Okla. Crim. App. 2006). He spent approximately $1,000 per day to support his habit. *See id.* Eventually, he ran out of money. *See id.* On March 5, following a three or four-day cocaine binge, he was desperate for cocaine and robbed a convenience store. *See id.* But the money he took from the store was insufficient, so later that day he went over to Al Hale's house. *See id.* Hale and Coddington were friends, and Coddington knew that Hale usually kept large sums of cash (on March 5, Hale had over $24,000 in cash in his home). *See id.*

Coddington did not immediately ask Hale for money—he watched TV with him for a couple hours. *See id.* At some point though, Coddington asked Hale if he could borrow some money. *See id.* According to Coddington, Hale could tell that Coddington

2

had "relapsed on drugs." 2003 Tr. VI at 47. He refused Coddington's request, told him to go back to treatment, and then asked him to leave. *Id*. at 48. Coddington began to leave. *Id*. But after noticing a hammer on the counter when he walked through the kitchen toward the door, Coddington stopped. State Ex. 89 at 14. Hale then went into the kitchen and "pushed[*] [Coddington] and told [him] to get out." 2003 Tr. VI at 76. Coddington then grabbed the hammer and hit Hale in the head, causing him to fall. *Id*. at 69. When Hale was lying face-down on the ground, Coddington hit him several more times in the back of the head. *Id*. at 69–70. He then took the money that Hale had on his person ($525) and, believing Hale was dead, left the house. State Ex. 89 at 15.

Coddington was mistaken; Hale was not dead. *See id.* at 443. Hale's son, Ron, discovered his father later that day. *See id.* There was "blood and blood spatter everywhere." *Id.* "Hale was lying in his bed, soaked in blood, still breathing but unable to speak." *Id.* Hale had moved from the kitchen to his bedroom. *See id.* Hale was rushed to a hospital, where he died 24 hours later. *See id.* The autopsy showed he died from blunt-force trauma to the head. *See id.*

After Coddington left Hale's house, Coddington immediately bought more cocaine and continued committing crimes to finance his purchases. He robbed five more convenience stores. *See id.* at 442. When he eventually got back home, he threw the hammer in a creek behind his apartment. *See id.* at 455.

---

[*] Coddington told the police that Hale pushed him, but he did not volunteer this information in his trial testimony. State Ex. 89 at 15; 2003 Tr. VI at 49.

Two days later, the police arrested Coddington at his apartment. *See id.* at 443. When the police arrived, Coddington began voluntarily making statements. *See id.* at 447. Realizing that Coddington may have been starting to confess, the police officers read him his *Miranda* rights. *See id.* Coddington waived his *Miranda* rights and continued making statements to officers. *See id.* About two to three hours after he initially waived his rights outside of his apartment, the police officers interrogated him at the station. *See id.* At the station, the officers reminded Coddington of his waiver from a few hours earlier, and Coddington stated he remembered waiving his rights. *See id.* Coddington then confessed to the convenience store robberies and to murdering Hale. *See id.* at 443.

At the station, Coddington was able to recall the murder in detail. *See* State Ex. 89 at 13–21 (Transcript of Police Station Interview); *see also* 2003 Tr. VI 47–48, 62–63. He recalled the clothes he wore, that he and Hale conversed for a couple hours, that they watched TV, that he had gone to Hale's home to ask for money, that Hale refused his request for money, that Hale then asked him to leave, and that he struck Hale with a claw hammer as Hale was showing him out. *See* State Ex. 89 at 14–15. He also remembered specific details about the hammer—that it had a chrome handle with a rubber grip. *See id.* at 20. He remembered how many times he struck Hale. *See id.* at 15. He remembered how much money he took from Hale's person and the denominations of the bills. *See id.* at 18. Finally, he stated that he did not call the police when he left Hale's home because he did not want to get caught. *See Coddington*, 142 P.3d at 443.

4

The state charged Coddington with multiple armed robberies, murder, and robbery with a dangerous weapon. Coddington pleaded guilty to six armed robberies and proceeded to trial on the murder and robbery with a dangerous weapon charges. Prior to trial, the court resolved two motions *in limine* relevant to this petition. First, the court considered the state's motion to exclude Coddington's expert's testimony on whether Coddington was able to form intent. *See id.* at 448–51. Coddington proffered that his expert—Dr. Smith—would have testified that his cocaine use leading up to and during the murder rendered him unable to form malice aforethought. *See id.* at 448–51. The state moved to have this portion of Dr. Smith's testimony excluded, and the trial judge granted the motion. *See id.*

Second, the court considered Coddington's motion to suppress his confession. *See id.* at 446–48. Coddington believed that he did not knowingly or voluntarily waive his *Miranda* rights. *See id.* The court did not agree and denied the motion. *See id.*

The case proceeded to trial. At the guilt phase of trial, the jury convicted Coddington of first-degree murder and robbery with a dangerous weapon. *See id.* at 442. At the sentencing phase, the jury found the existence of two aggravating circumstances and sentenced Coddington to death. *See id.* Coddington appealed his conviction and sentence to the OCCA. *See id.* Among other things, he challenged the pretrial rulings (1) denying his motion to suppress his confession and (2) excluding a portion of Dr. Smith's testimony. *See id.* at 446–51. The OCCA first concluded that Coddington's confession was sufficiently knowing and voluntary, but it agreed with Coddington that the trial court erred by restricting Dr. Smith's testimony. *See id.* The OCCA summarily determined

5

that this amounted to a constitutional error and applied *Chapman v. California*, 386 U.S. 18 (1967), to determine whether the error was harmless beyond a reasonable doubt. *See id.* at 448–51. The OCCA determined that the evidence that Coddington acted with malice aforethought was overwhelming. *See id.* at 451. Accordingly, it held that "Dr. Smith's expert opinion on the ultimate issue of whether Coddington could form the requisite malice would not have made a difference in the jury's determination of guilt." *Id.*

The OCCA similarly rejected Coddington's other guilt-phase arguments and affirmed his conviction. It did, however, find that reversible error occurred at the sentencing phase. *See id.* at 461.[†] It therefore vacated Coddington's death sentence and remanded for resentencing. *See id.* At resentencing, the jury found the existence of aggravating circumstances and again sentenced Coddington to death. *Coddington v. State*, 254 P.3d 684, 693 (Okla. Crim. App. 2011). The OCCA affirmed, *see id.* at 718, and the United States Supreme Court denied certiorari, *see Coddington v. Oklahoma*, 565 U.S. 1040 (2011). Coddington then filed a petition for post-conviction relief with the OCCA. *Coddington v. State*, 259 P.3d 833 (Okla. Crim. App. 2011). The OCCA denied the petition. *See id.* at 840. Subsequently, Coddington filed a 28 U.S.C. § 2254 petition.

---

[†] The OCCA found that the trial court made two reversible errors during the sentencing phase. The first was that the court did not allow Coddington to play a video tape of his mother's testimony, but instead only allowed Coddington to show the jury a written transcript of it. The trial court's second error was its allowance of a confusingly-worded jury instruction that potentially misled the jury about the significance of various testimony from Coddington's family members. *Coddington*, 142 P.3d at 460–61.

*Coddington v. Royal*, No. CIV-11-1457-HE, 2016 WL 4991685 (W.D. Okla. Sept. 15, 2016).

In his § 2254 petition, Coddington raised nine grounds for relief. *See id.* at *1. The district court denied relief on all of them. *See id.* We granted a Certificate of Appealability (COA) as to the first and second grounds: (1) whether the OCCA unreasonably applied federal law when it held that the exclusion of Dr. Smith's testimony was harmless, and (2) whether the OCCA unreasonably applied federal law when it affirmed the lower court's decision that Coddington's waiver of his *Miranda* rights was knowing and voluntary.

## II.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the standard under which we review the district court's disposition of a state petitioner's habeas petition depends on how the claim at issue was resolved in the state court. *Byrd v. Workman*, 645 F.3d 1159, 1165 (10th Cir. 2011). Here, because the issues in Coddington's habeas petition were already adjudicated on the merits by the OCCA, "we review the district court's legal analysis of the state court decision de novo." *Littlejohn v. Trammell*, 704 F.3d 817, 825 (10th Cir. 2013). We therefore—like the district court before us—review the OCCA decision under the AEDPA deference standards.

The AEDPA, 28 U.S.C. § 2254(d), provides that:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

7

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is contrary to federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Valdez v. Bravo*, 373 F.3d 1093, 1096 (10th Cir. 2004) (quotations omitted) (alterations in original). Relatedly, a decision is an unreasonable application of federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (same). Finally, a federal court may only grant habeas relief if "there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents." *Frost v. Pryor*, 749 F.3d 1212, 1223 (10th Cir. 2014) (quotations omitted).

III.

In his first claim for relief, Coddington argues that the trial court deprived him of his constitutional right to present a defense when it refused to allow his expert to testify that he was unable to form the requisite intent for malice murder, and that the OCCA wrongfully concluded that the trial court's error was harmless. We affirm the district court's denial of this claim, concluding that the OCCA did not unreasonably apply

8

*Chapman* in holding that the exclusion of a portion of Dr. Smith's testimony was harmless.

A.

On direct appeal, a state appellate court evaluates a state trial court's federal constitutional error for harmlessness. *See Chapman v. California*, 386 U.S. 18 (1967). Specifically, the court considers whether the state has proven beyond a reasonable doubt that the federal constitutional error was harmless. *See id.* When a state court's *Chapman* decision is reviewed by a federal court under AEDPA, "a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself was unreasonable*." *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (emphasis in original). This AEDPA limitation to *Chapman* is subsumed by the *Brecht* test for harmlessness, which is used by courts engaging in collateral review. *Id*. Under this test, a petitioner cannot gain relief for a trial court's error unless he can establish that the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quotations omitted). In other words, the petitioner must establish actual prejudice. *See id.* Coddington must therefore "show that he was actually prejudiced by" the trial court's failure to admit the expert's testimony, "a standard that he necessarily cannot satisfy if a fairminded jurist could agree with the [OCCA's] decision that [the error] . . . met the *Chapman* standard of harmlessness." *Davis*, 135 S. Ct. at 2199.

The *Brecht* test for harmlessness also applies to Coddington's claim that the trial court's rejection of Dr. Smith's testimony separately amounted to a violation of due

9

process.  Any constitutional due process violations are likewise reviewed for harmlessness.  *See Patton v. Mullin*, 425 F.3d 788, 800 (10th Cir. 2005) (applying *Brecht* harmlessness analysis to petitioner's allegation of due process violation at trial).‡

B.

As a preliminary matter, the state argues that Coddington has not shown the existence of a constitutional error sufficient to trigger *Chapman*/*Brecht*.  *See* Resp.'s Br. at 16 ("[T]he application of the *Brecht* harmless error standard presupposes the existence of an actual federal constitutional error.").  It contends that expert testimony on the ultimate issue of intent is generally not allowed in the federal system because it is prohibited by Federal Rule of Evidence 704.  *See* Fed. R. Evid. 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.").  Additionally, it notes that multiple federal courts—including the Tenth Circuit—have upheld Rule 704 in the face

---

‡ We have previously stated that "once a showing of fundamental unfairness is made, a petitioner is entitled to habeas relief without an assessment of harmless error." *Spears v. Mullin*, 343 F.3d 1215, 1229 n.9 (10th Cir. 2003).  We based this statement on our belief that the fundamental unfairness inquiry "essentially duplicate[s] the function of harmless error review." *Id.* (alteration in original) (quotations omitted).  The Supreme Court, however, has commented that "the *Chapman* harmless-error standard is more demanding than the 'fundamental fairness' inquiry of the Due Process Clause." *Greer v. Miller*, 483 U.S. 756, 765 n.7 (1987).  One standard that is less demanding than another cannot "duplicate" the more demanding standard.  Accordingly, we decline to follow this court's earlier holding in *Spears* that would preclude harmlessness review when a due process violation is found on habeas review. *See* Bryan A. Garner et al., *The Law of Judicial Precedent* 303–04 (2016) (noting that, while earlier horizontal precedent nearly always controls, an exception exists if that decision was "clearly contrary to a then-standing vertical precedent").

of constitutional challenges because testimony on the ultimate issue of intent is not actually evidence. *See id.* at 17 (citing *United States v. Austin*, 981 F.2d 1163, 1165 (10th Cir. 1992)). Under those precedents, the testimony Coddington sought to have admitted was not evidence at all. *See, e.g.*, *Austin*, 981 F.2d at 1165. So, the argument goes, Coddington's constitutional right to present a defense was not violated, and the analysis should end there.

We disagree. Even if a state law violation cannot be tied to the denial of a specific federal constitutional right (such as the right to present a defense), it is still reviewed to determine whether the violation "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Romano v. Oklahoma*, 512 U.S. 1, 12 (2004). And whether we analyze Coddington's claim as a violation of a specific constitutional right or as a violation of constitutional due process, we still must determine whether the alleged error was harmless. *See Patton*, 425 F.3d at 800 ("[A]ny trial errors will be deemed harmless unless they had a substantial and injurious effect or influence in determining the verdict. . . . If we are in grave doubt as to the harmlessness of an error, the habeas petitioner must prevail.").

Because we ultimately conclude that the trial court's error in excluding a portion of Dr. Smith's testimony was harmless, *see infra*, we need not determine whether the error committed by the trial court amounted to a violation of a specific constitutional right or a more general constitutional due process violation. Instead, we "assume, without deciding, that the error[ ] [Coddington] identifies . . . [is] of constitutional magnitude." *Malone v. Carpenter*, 911 F.3d 1022, 1032 n.1 (10th Cir. 2018) (rejecting

11

state's argument that habeas relief was not available because there was no constitutional violation).

C.

The OCCA concluded that, even if Dr. Smith had been permitted to testify on intent, the jury would have still found malice aforethought. *See Coddington*, 142 P.3d at 451. Coddington argues that the OCCA's harmlessness determination was unreasonable because, while he was allowed to present substantial testimony about the effects of cocaine use, none of the evidence went to whether he was able to form the requisite intent. *See* Pet'r Br. at 17–26. After reviewing the state court record, we do not find that the exclusion had a substantial and injurious effect on the jury's verdict. First, though he was unable to present testimony explicitly asserting that his cocaine use might have precluded his ability to form malice aforethought, Coddington was permitted to present copious testimony on how his cocaine use negatively affected his rationality and self-awareness. Second, it was disputed as to whether Coddington was even intoxicated at the time of the murder. And third, the excluded testimony would have been heavily contradicted by other evidence in the record indicating that Coddington not only was capable of self-awareness, but that he indeed hit Hale with the deliberate intent "to take away [his] life." *See* Criminal Appeal Original Record (C.A.O.R.) I at 88 (jury instruction defining "malice aforethought").

1.

Even without Dr. Smith's excluded testimony, the jury considered evidence regarding Coddington's cocaine use and the ill-effects of such use on his brain. Dr.

12

Smith told the jury that he had diagnosed Coddington with cocaine dependency. *See* 2003 Tr. V at 81. He then told the jury that cocaine affects the "thinking part of the brain," i.e., the cortex and frontal lobes. *See id.* at 81–82. He also told the jury that the cortex is what "makes you aware of yourself and what you're doing and your ethics and your judgment and how to make decisions and therefore how to behave." *Id.* at 82. He showed the jury a PET-scan of a drug-addict's brain to give the jury a visual representation of how drug use can cause brain damage. *See id.* at 83. He further told the jury that cocaine use can cause paranoia and agitation. *See id.* at 88.

Dr. Smith then applied these general statements about cocaine use to Coddington in particular. He noted that Coddington's cocaine use "had a marked effect on [Coddington's] brain function" the day of the murder. *See id.* at 92.

> It made him -- it had multiple effects on his brain function. His paranoia, his fearfulness, his belief he was being followed and watched constantly, his desperation to get more cocaine, his over-responsiveness to stimulation of any kind, including touching. So I think it markedly affected his ability to exercise reasonable judgment and control.

*Id.* Dr. Smith also told the jury that Coddington's cocaine binge likely made these effects even worse. Specifically, it likely made it "difficult for [Coddington] to control his behavior." *See* 2003 Tr. VI at 5. He testified that, to a reasonable degree of medical certainty, Coddington was not thinking reasonably or rationally. *See id.* at 6.[§]

---

[§] Coddington also contends that the OCCA's opinion is internally inconsistent. He says that the OCCA acknowledged that Dr. Smith's excluded testimony would have lowered the degree of murder. *See* Pet'r Br. at 18. This assertion is factually inaccurate. The OCCA stated that Dr. Smith's testimony would have lowered the degree of murder *if the jury believed it*. *See Coddington*, 142 P.3d at 451. The OCCA then went on to explain that the jury would not have believed it. *See id.*

13

In addition to Dr. Smith's comprehensive testimony, Coddington himself testified that he never intended to kill Hale. He also stated that the murder basically just happened: "the next thing I know he was laying on the floor and I had hit him with [the hammer]." *Id.* at 48. Also, Coddington's counsel repeatedly argued that Coddington's cocaine use and addiction rendered him incapable of forming the requisite intent. Counsel referred to the killing as "mindless" and having occurred "in the middle of a drug-inspired frenzy." *Id.* at 150–51. In fact, in closing, Coddington's counsel explicitly told the jury that Coddington's "cocaine intoxication rendered him at the moment of truth incapable of forming malice aforethought." *Id.* at 161.

2.

With or without the excluded portion, the jury might have disregarded Dr. Smith's testimony altogether if it found that Coddington was not "intoxicated" at the time of the murder. Coddington offered Dr. Smith's testimony to support his intoxication defense, which applies where the defendant's "mental powers" were so "overcome with intoxication" that it would have been "*impossible* [for him] to form the special state of mind known as malice aforethought." C.A.O.R. I at 106 (Jury Instruction 39) (emphasis added). But Dr. Smith's testimony focused less on how a person behaves while intoxicated from cocaine and more on how repeated cocaine use can damage a person's brain. He explained that cocaine can impair a person's judgment and self-awareness by damaging their pre-frontal cortex. He described these effects not necessarily as cocaine intoxication, but instead as "cocaine dependency." 2003 Tr. V at 81. And it is unclear

14

whether the jury would have equated such chronic effects of cocaine with the "intoxication" language existing in the pertinent jury instruction.

With the above said, the jury considered evidence that Coddington likely was not "high" at the time of the murder. Dr. Smith informed the jury that the "high" from cocaine can last anywhere from several minutes to several hours. *Id.* at 94. On numerous occasions, Dr. Smith described the effects of cocaine as "momentary." *Id.* at 64, 66. His testimony further suggested that *smoking*—which was Coddington's typical method of ingestion—crack cocaine typically resulted in a "quicker" high. *Id.* at 63. With that said, Coddington was at Hale's house for roughly two to three hours before he murdered Hale. Therefore, for Coddington to have been intoxicated with cocaine at the time of the murder, he likely would have either had to have smoked cocaine while at Hale's house, or potentially immediately before arriving there.

And whether Coddington had indeed smoked cocaine while—or immediately before—visiting Hale was in dispute during the trial. Coddington testified at trial that he smoked cocaine in Hale's bathroom during the visit. 2003 Tr. VI at 47. And Dr. Smith testified that Coddington had allegedly smoked cocaine sometime before arriving at Hale's house. *Id.* at 29. However, this testimony contrasts with Coddington's original confession during which he described the murder and surrounding events in detail, yet never alleged that he had smoked crack cocaine in Hale's bathroom. *Id.* at 55; State Ex. 89.

Moreover, in contrast to the above testimony, other evidence showed that it was implausible for Coddington to have possessed and smoked cocaine at those alleged times.

15

By Coddington's own admission, after conducting a robbery or a burglary, he would immediately use the stolen money to buy cocaine, and "as soon as [he] bought that cocaine [he] smoked it up." *Id*. at 56. "And when [he] got to wanting another fix [he] went and got some money and did the same thing." *Id*. On the day of the murder, which occurred sometime between 6:00pm and 7:00pm, the last time Coddington had stolen money was at 2:30am when he robbed a convenience store. *Id*.[**] These admissions from Coddington suggest that the last time he would have smoked cocaine on the day of the murder was likely early in the morning after his last robbery, and that it would have been uncharacteristic of him to have retained enough cocaine to smoke it in the evening. And the fact that Coddington—again, by his own admission—quickly after the murder bought more cocaine with the money he took from Hale's wallet further suggests that Coddington had already run out of the narcotic by that time and was desperate for more. *See id*. at 78.

The jury therefore considered evidence suggesting that Coddington likely did not ingest cocaine immediately before or during his visit with Hale, and that the effects of any cocaine he smoked earlier in the day likely would have receded by the time of the

---

[**] In his trial testimony, which took place over six years after the murder, Coddington said he did not remember whether he committed any robberies between the time he robbed the 7-11 at 2:30am and the time of the murder. 2003 Tr. VI at 56. However, during his interrogation two days after the murder, he indicated that he did not conduct another robbery until *after* the murder. Ex. 8 at 5, 20 (asserting that his first robbery—the 7-11—took place on Tuesday night, while his second robbery—the Texaco—took place on Wednesday night after the murder). Further, Coddington pleaded guilty to six robberies, the first of which was the 7-11 at 2:50am on March 5, and the second of which was the Texaco at 1:15am on March 6. C.A.O.R. I at 12–13.

16

murder. Considering this evidence, the jury could have found that Dr. Smith's excluded testimony—about Coddington's alleged inability to form the requisite intent while under the influence of cocaine—was irrelevant altogether.

3.

Even if the jury believed that Coddington was under the influence of cocaine—from either a "high" or other cocaine-related effects—at the time of the murder, it still likely would have found Coddington was capable of forming the requisite intent of malice aforethought. Coddington testified that though he decided to take the cash from Hale's pocket, he deliberately refrained from taking Hale's diamond ring because he "couldn't do that." State Ex. 89 at 15. Therefore, if Coddington was indeed "high" at the time of the murder, his actions immediately thereafter showed that he was nonetheless capable of self-awareness during that period. Additionally, while allegedly "high on cocaine," Coddington successfully robbed three venues and intentionally began targeting gas stations because they were more likely to carry cash. 2003 Tr. VI 58, 80; State Ex. 89 at 4–7, 9, 11. And during one of these robberies, Coddington devised a scheme in which he first scoped-out the venue while pretending to buy a soft drink, then—after ensuring the store was empty—returned with a knife so that he could rob the clerk. *Id*. at 57.

Further, the available evidence showed not only that Coddington was capable of self-awareness at the time of the murder, but that he indeed had formed malice aforethought when killing Hale. We agree with the OCCA that "the circumstances surrounding [t]his murder suggest it was committed with intent. Coddington attacked

17

Hale after Hale refused to give him money for drugs. He hit Hale with the hammer three times; Hale had defensive wounds, and there was significant blood spatter." *Coddington*, 142 P.3d at 455–56. Not only did Coddington hit Hale so hard that he made Hale fall over, but he continued to pound the back of Hale's head with the hammer while Hale was lying face-down on the floor. 2003 Tr. VI at 69–70. The repetition and force with which Coddington struck Hale, along with evidence suggesting that Hale tried to defend himself, could support a finding that Coddington had formed "the deliberate intention to take away the life of a human being." C.A.O.R. I at 88 (jury instruction defining "malice aforethought").

4.

In sum, we conclude that Coddington was not prejudiced by the trial court's decision to exclude Dr. Smith's testimony that, in his opinion, Coddington "would not have been able to form the intent of malice aforethought" while "experiencing the effects of the cocaine." 2003 Tr. V at 81. Despite the exclusion, the jury still heard evidence about how cocaine could have made Coddington unaware of what he was doing. And even with the excluded testimony, the jury still would have had to grapple with whether Coddington was indeed intoxicated at the time of the murder. Regardless, Dr. Smith's excluded testimony would have been contradicted by evidence showing not only that Coddington was capable of self-awareness at the time of the murder, but that he repeatedly hit Hale with the intent to deliberately take away his life. Given this, we simply cannot conclude that no "fairminded jurist could agree with the [OCCA's] decision that," beyond a reasonable doubt, Dr. Smith's testimony regarding intent would

18

not have made a difference in the outcome of the trial.[††]  *Davis*, 135 S. Ct. at 2199.  Put another way, we do not find that the exclusion "had [a] substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637.

## IV.

In his second claim for relief, Coddington argues that his confession to the murder should have been suppressed because he did not knowingly and voluntarily waive his *Miranda* rights.  We find that the OCCA did not unreasonably apply federal law in concluding that Coddington's waiver was both knowing and voluntary.  Neither the delay between Coddington's confession and the station-house interrogation, nor Coddington's drug use, were sufficient to render his confession unknowing or involuntary.

## A.

Testimony from a custodial interrogation will be suppressed if the prisoner did not knowingly and voluntarily waive his *Miranda* rights.  *See Patterson v. Illinois*, 487 U.S. 285, 292 (1988); *see also Miranda v. Arizona*, 384 U.S. 436 (1966).  This "inquiry has two distinct dimensions."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

---

[††] As noted above, the district court concluded that the OCCA's determination was not unreasonable.  In the alternative, it held that even if the exclusion of Dr. Smith's testimony was not harmless, the jury would have still convicted Coddington of first degree felony murder (because it convicted him of robbery with a dangerous weapon).  *See Coddington*, 2016 WL 4991685, at *6.  Because we conclude the OCCA's determination was not unreasonable, we do not address the district court's alternate holding.

19

*Id.*

"We engage in a totality of the circumstances approach, where no single factor—whether intoxication, exhaustion, or other—is dispositive." *United States v. Burson*, 531 F.3d 1254, 1258 (10th Cir. 2008). However, one circumstance that is *not* relevant to our analysis is whether the suspect was aware of each possible subject of questioning. *See Colorado v. Spring*, 479 U.S. 564, 577 (1987) ("[A] suspect's awareness of all the possible subjects of questioning in advance of interrogation is *not relevant* to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." (emphasis added)). Additionally, "[t]he mere fact of drug or alcohol use will not" render a confession unknowing or involuntary. *Burson*, 531 F.3d at 1258. Drug use will only render a confession unknowing if it rises "to the level of substantial impairment." *Id.* ("The defendant must produce evidence showing his condition was such that it rose to the level of substantial impairment [because] . . . [o]nly then could we conclude the government has failed to prove the defendant possessed full awareness of both the nature of his rights and the consequences of waiving them."). Likewise, drug use will render a confession involuntary only if the suspect's "will was overborne by the circumstances surrounding the giving of a confession." *United States v. Smith*, 606 F.3d 1270, 1276–77 (10th Cir. 2010) (quotations omitted).

B.

Coddington advances several arguments for why his waiver was unknowing and involuntary. *See* Pet'r Br. at 30–39. First, he contends that the officers misled him about the nature of their questioning. Specifically, Coddington believes that the officers told

20

him that they wanted to question him about the robberies, when they clearly intended to also question him about Hale's murder. Coddington's argument is unconvincing. "[A] suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Spring*, 479 U.S. at 577. The OCCA's rejection of this argument, therefore, was a reasonable application of federal law. *See Coddington*, 142 P.3d at 448 (citing *Spring*, 479 U.S. at 573, 577 to conclude trial court properly admitted Coddington's confession).

Second, Coddington argues that the interrogation at the police station occurred 2.5 to 3 hours after the officers initially read him his *Miranda* rights at his home. He believes that this time gap between his waiver and the interrogation rendered his confession unknowing. This argument overlooks key facts. First, before the police officers interrogated Coddington at the police station, they asked him if he remembered being advised of—and subsequently waiving—his *Miranda* rights several hours earlier; and Coddington replied in the affirmative. *Id.* at 447; State Ex. 89 at 1–2. This court has found that such a reminder under similar circumstances was adequate. *See Burson*, 531 F.3d at 1259 (concluding the defendant "knew his constitutional rights" where the interrogating officer "asked [the defendant] if he remembered the *Miranda* warning he was given at the time of his arrest less than two hours earlier" and the defendant "responded affirmatively"). Second, Coddington had previous encounters with law enforcement and was familiar with his *Miranda* rights. The Tenth Circuit has previously held that a suspect's knowledge of *Miranda* rights from previous encounters with law

21

enforcement is an appropriate consideration in determining whether a later waiver is voluntary. *Smith v. Mullin*, 379 F.3d 919, 934 (10th Cir. 2004). Accordingly, it was proper for the OCCA to consider Coddington's previous law enforcement encounters in its analysis. *Coddington*, 142 P.3d at 448 ("[F]rom his prior contacts with law enforcement and prior convictions, we can assume he was familiar with and understood the concepts encompassed in *Miranda*." (quotations omitted)).

Third, Coddington contends that he could not have knowingly or voluntarily waived his rights because he was intoxicated and sleep-deprived. It is well established that intoxication alone will not render a confession involuntary. The intoxication must rise to the level of "substantial impairment" to render the confession unknowing. *See Burson*, 531 F.3d at 1258, 1260 (finding that the defendant—who was allegedly "exhausted" and under the influence of drugs during an interrogation—voluntarily and knowingly waived his rights where his "mental faculties were sufficient for him to engage in an intelligent, rational dialogue with [the officer]"). Similarly, for intoxication to render a confession involuntary, the circumstances of the confession must show that the suspect's will was overborne. *See Smith*, 606 F.3d at 1276–77.

The OCCA's decision was consistent with these legal principles. Looking first to the knowingness of Coddington's confession, the OCCA observed that "[s]elf-induced intoxication, short of mania, or such an impairment of the will and mind as to make the person confessing unconscious of the meaning of his words, will not render a confession inadmissible, but goes only to the weight to be accorded to it." *Coddington*, 142 P.3d at 448 (quotations omitted). The OCCA then held that Coddington's will was not

22

sufficiently impaired to render his confession inadmissible. *See id.* This was not an unreasonable application of federal law. Coddington was able to recall "specific details about the robberies and Hale's murder, and appeared to understand exactly what was going on." *Id.* This shows that, like the defendant in *Burson*, Coddington's "mental faculties were sufficient" enough for him to voluntarily and knowingly waive his rights. *Burson*, 531 F.3d at 1260.

Coddington also argued before the OCCA, as he does here, that his heightened intoxication is demonstrated by the fact that he confessed to crimes that authorities in Oklahoma were unable to corroborate. However, we agree with the OCCA that this fact on its own "does not show he was so intoxicated that his *Miranda* waiver was not knowingly and voluntarily made." *Id.* Coddington confessed to numerous crimes that Oklahoma *was* able to verify, and he recalled specific details from those crimes.

Finally, the OCCA did not unreasonably apply federal law in concluding that Coddington's drug use did not render his confession involuntary. *See id.* at 447–48. The totality of the circumstances demonstrate that Coddington was aware of his surroundings and that the officers did not pressure or coerce him into confessing. Accordingly, even if Coddington was intoxicated at the time of the confession, Coddington has not shown that his "will was overborne." *Smith*, 606 F.3d at 1276 (quotation marks omitted).

V.

For the reasons set forth above, we AFFIRM the district court's denial of Coddington's petition for habeas relief.